[Sac. No. 2115. In Bank.—June 1, 1915.]

CALIFORNIA-CALAVERAS MINING COMPANY (a Corporation), Respondent, v. JOHN A. WALLS and E. W. WILSON, Appellants; W. O. MANSON, A. J. JARMUTH, and H. R. McGUINN, Defendants.

CORPORATIONS—PROMOTERS IN FIDUCIARY RELATION—FRAUD—SECRET PROFIT.—Where a promoter interests certain parties in a plan to purchase property at a stated price, conveys it to a corporation to be formed in which all shall hold shares, the plan being to sell stock to the public through the promoter as trustee for the corporation, and the money required for the first payment is advanced by his associates and that for the subsequent payments is expected to be received from the subscriptions of stockholders to become such in future, a secret profit obtained by the promoter by misrepresenting the price at which the property can be acquired, and selling it to the corporation at a higher price than he paid for it, such secret profit, being represented by a note of the corporation held by the promoter, is fraudulent, and the corporation itself, as the representative of the stockholders as to their collective interests in the corporation, can compel a cancellation of the note for such

fraud although at the time of the transfer of the property from the promoter to the corporation he held all of its stock.

ID.—DUTY OF PROMOTER TOWARD STOCKHOLDERS.—A promoter occupies a fiduciary relation to all persons associated with himself in the promotion of a corporation to acquire interests controlled by himself, and likewise to all persons who it is expected shall subsequently become stockholders and participate in the venture.

FINDINGS—SUPPORTED BY EVIDENCE LACKING CREDIBILITY.—A finding of fact, contrary to the direct evidence of the only witness testifying directly to the question of the fact found, will not be disturbed on appeal where the testimony and the circumstances surrounding the transaction are such as to deprive that testimony of all credibility.

APPEAL from a judgment of the Superior Court of Calaveras County. A. I. McSorley, Judge.

The facts are stated in the opinion of the court.

Metson, Drew & Mackenzie, John Hancock, and Horatio Alling, for Appellants.

Clarence S. Darrow, Evan Williams, Chickering & Gregory, Devlin & Devlin, and Snyder & Snyder, for Respondent.

LORIGAN, J.—The plaintiff corporation sued for a decree canceling a promissory note for one hundred thousand dollars delivered by it to defendant Walls; to have annulled a trust deed made by it to defendant Wilson, as trustee, to secure said note; to have canceled certain stock certificates issued by plaintiff and held by defendants Manson, Jarmuth, and McGuinn, and for an accounting by Manson to plaintiff. Manson was served by publication and failing to appear his default was entered. The action was dismissed as to the defendant McGuinn. Jarmuth, Walls, and Wilson answered and contested the right of the plaintiff to recover. Plaintiff obtained a decree canceling said note, annulling said trust-deed, canceling all stock certificates issued by the corporation to and held by Manson and Jarmuth, and also a judgment against Manson and Jarmuth for eighty-three thousand five hundred dollars. Defendants Walls and Wilson appeal.

The findings are very full and as far as practical we epitomize them; as also other facts in the case.

The court found that defendants Manson and Jarmuth prior to January 7, 1907, became familiar with a mining and ranch property consisting of seven thousand two hundred acres located in Calaveras and Sutter counties in this state, the property of a Mrs. Caroline Wright, which she was offering for sale for one hundred and twenty thousand dollars, and a sale of which at that figure they had discussed with her. About January 7, 1907, Manson, for himself and Jarmuth, visited Chicago for the purpose of interesting parties there in the purchase of this property. He got into conference with David T. Adams, J. H. James, Edmund D. Brigham, John T. Jones, and Paul Brown, residents of Chicago, and hereafter to be designated the Chicago parties. He sought the co-operation of these parties with himself and Jarmuth in the purchase of this property. Several meetings and conferences were had between them on the subject in which Manson stated that he had a verbal option on the property for two hundred and fifty thousand dollars, but was endeavoring to get it for less; that he, being well acquainted with its owner, could purchase it for less than any one else; that he would, however, require Jarmuth's services to effect it, but that he, Manson, would attend to the entire matter for the benefit of all of them should they join with him in purchasing it. Some of the Chicago parties wanted to visit the property, but Manson protested against their doing so, stating that the owner was an old woman, highly nervous, and that if she learned that Eastern parties were trying to purchase the property she would become excited and raise its price. As a result of these conferences, the Chicago parties believing all these representations of Manson, it was agreed that they and Manson and Jarmuth should co-operate in the purchase of it. As the most convenient way of accomplishing this, it was agreed between them that a corporation should be formed and stock thereof distributed to all associated in the enterprise; that all of them would compose the corporation; that the Chicago parties would finance the corporation to be so formed by purchasing or causing to be purchased such of its stock as would be necessary to place sufficient funds in the treasury to pay certain promissory notes to be issued by the corporation; that Manson should act in the organization of the corporation, attend entirely to the purchase of the mining property, transfer it to the corporation,

and on the assumption of the truth of Manson's statement that the least price at which it could be purchased by him from its owner for the benefit of said proposed corporation was two hundred and fifty thousand dollars, that in payment therefor the corporation should make and deliver to Manson its three promissory notes for one hundred thousand dollars each—the fifty thousand dollars above the actual price of the mining property to be paid to Manson by the corporation, as he insisted it should be, as his profit for his services in attending to the securing of the property for the mutual benefit of all concerned and the formation of the corporation to take it over. This arrangement being reached between the parties, on January 7, 1907, a written agreement for the purpose of carrying it out was signed by Manson and Brigham, the latter as representing himself and the other Chicago parties in the transaction. This agreement provided that Manson should organize the plaintiff corporation in California with a capital stock of two million five hundred thousand dollars divided into five hundred thousand shares of the par value of five dollars each; that its directors should consist of seven members to be selected by Manson; that on the organization of the corporation Manson should transfer to it the mining property, and in full payment therefor the corporation should issue to Manson all its capital stock fully paid up and nonassessable, and deliver to him three of its promissory notes for one hundred thousand dollars each without interest, due, respectively, February 5, 1907, March 5, 1907, and April 5, 1907; that of this 500,000 shares of the capital stock Manson should transfer to the treasury of the corporation 150,000 shares as a fund for future use by the corporation; that 199,965 shares of said 500,000 shares should be deposited with a trustee to be delivered on payment of said three promissory notes, as follows: 50,000 shares to Brigham, 107,143 shares to Brigham for himself and his assignees, and 42,822 shares to Manson; that further, of said 100,000 shares Manson should forthwith turn into the treasury of the corporation 150,000 shares to be issued by it to Paul Brown, as trustee, to be sold by him for the corporation at par on certain terms of payment specified in the agreement.

On the execution of this agreement Manson immediately came to California and he and Jarmuth visited Mrs. Wright. She had given an option to Jarmuth on this property for

one hundred and twenty thousand dollars before any negotiations were entered into with the Chicago parties and would have sold it at any time for that figure. At this conference Mrs. Wright agreed to sell it to Manson for one hundred and twenty thousand dollars—seventy-five thousand dollars in cash—and the delivery of certain bonds and a note and mortgage held by Jarmuth representing the balance—and on January 21, 1907, deposited in escrow with a certain bank a deed to Manson of the property to be delivered to him on payment of the money and delivery of the bonds and note and mortgage on or before February 10, 1907. On January 21, 1907, Manson caused to be carried out the written agreement between himself and the Chicago parties as far as its literal terms are concerned. He caused the corporation plaintiff to be organized, conveyed to it one-half of the mining property and in consideration therefor the corporation issued and delivered to him all its capital stock. At an adjourned meeting on the same day he conveyed to the corporation the other half of the property and delivered to it as treasury stock of the corporation 300,000 of said shares issued to him and received from the corporation the three promissory notes for one hundred thousand dollars each payable at the respective dates without interest as provided in the agreement. The other terms of the agreement as to the distribution of the shares of stock by Manson and the issuance by the corporation of the treasury stock to Brown were also carried out.

Prior to the maturity of the first note due February 7, 1907, Paul Brown, as trustee of said treasury stock of the corporation, obtained from various persons who had subscribed therefor the sum of ninety thousand dollars, the larger part of which was subscribed by the Chicago parties, including himself. This ninety thousand dollars, with ten thousand dollars subscribed by Manson, was deposited with the treasurer of the corporation to take up the first note and was paid over to Manson for that purpose. Manson paid seventy-five thousand dollars of this money to take up the Wright deed to him of this property deposited in escrow. The second note, maturing March 5, 1907, was paid on May 20, 1907, the money to pay it being received from the Chicago parties and the other purchasers of treasury stock of the corporation from Brown as trustee. The third note, maturing April 5, 1907, was not paid and Manson caused the corpora-

CLXX Cal.—19

tion to issue a renewal note to the defendant Walls with the trust-deed, both here involved, on his statement to it that prior to the maturity of said original note of April 5, 1907, he had sold and indorsed it to said Walls. This renewal note, dated April 6, 1907, was for one hundred thousand dollars, payable three years after date with interest at eight per cent per annum. Manson during all of these times and from the organization of the corporation was in control of it and was its president. Subsequent to the issuance by the corporation of this renewal note and trust-deed, the Chicago parties, as stockholders of the corporation, and other stockholders thereof who had contributed money for the purchase of the stock of the corporation to pay the purchase price of said mining property, discovered the truth of the facts as to the purchase price paid for said property by Manson, and having obtained control of the corporation brought this action in its name. As to the original note of April 5, 1907, the court found that Walls was not a purchaser of it for value, in good faith, without notice before its maturity, or at all; that in the transaction respecting the renewal note he was the agent of Manson and a mere ''dummy'' for him; that the original note was never indorsed or delivered to Walls until after its maturity; that Manson at all times after its issuance retained possession of it.

While many other findings were made by the court, still those we have referred to are the only ones necessary for consideration in determining the merits of the appeal of these particular appellants Walls and Wilson.

On these findings the decree herein was entered in favor of plaintiff.

As grounds for reversal it is urged: 1. That no fraud upon the plaintiff corporation was either alleged or shown affecting the validity of the notes given; 2. That the original note due April 5, 1907, for the renewal of which the trust-deed and note here in question were given, was indorsed and delivered by Manson to Walls for value before maturity and without notice; that Walls is the owner and holder of said trust-deed note and the findings of the court to the contrary are not sustained by the evidence; and, 3. That the trial court was without jurisdiction to adjudicate the alleged fraud of Manson or make any decree for the cancellation of the trust-deed note and annullment of the trust-deed, as it

appears on the face of the judgment-roll that Manson was not served with summons in this action.

It is to be noted that no attack whatever is made upon the findings that the representations and statements made to his associates, the Chicago people, by Manson, the prime mover in the promotion with them of the plaintiff corporation, for the express purpose of acquiring this mining and ranch property, as to the true price he could acquire it from its owner for the benefit of the proposed corporation they were to organize, were fraudulent and false. The sole contention of appellants is that, admitting this be fully proven, yet such fraud could in no way taint the transaction between Manson and the corporation itself so as to give the corporation as such a right of action to set aside its obligations on the notes. They concede that if at the time this mining property was exchanged by Manson for the stock and notes of the corporation, there were stockholders either nonassenting to the transaction or assenting by reason of ignorance of the true facts, and the transaction presented a secret profit to Manson, that a cause of action would arise in favor of the corporation. But they claim no such situation is shown by the findings; that on the contrary a situation where when the transactions between Manson and the corporation were consummated there were no stockholders of the corporation save Manson himself; that in his transactions with it he was in reality the corporation itself because of his ownership of all its capital stock; that hence no other person was interested in the transactions save himself as both seller and purchaser of the property; that his knowledge as sole stockholder was knowledge by the corporation of all the facts respecting the property and as with such knowledge the corporation consented to the transaction between himself and it, no fraud was or could be practiced upon the corporation itself.

As far as the Chicago parties, the associates of Manson, in promoting the plaintiff corporation, are concerned, appellants insist that they are not entitled, as the stockholders of the corporation now, to invoke the aid of a court of equity in the name of the corporation to avoid the trust-deed note; that as purchasers of stock subsequent to the incorporation of the plaintiff and the transfer of the property to it they might have a right of action against Manson for his antecedent fraud practiced on them whereby they were induced to subsequently

purchase stock, but that this was their individual right and remedy; that this, however, was not fraud for which the corporation itself could assert any right to set aside its note because, for the reasons first urged, the corporation itself was not defrauded.

Counsel for appellants marshall facts from the findings which they say present the situation which they have outlined and cite a number of authorities to sustain their contention that this being the situation no fraud was perpetrated upon the plaintiff corporation of which it can complain. They rely on a line of cases including, among others, *Parsons* v. *Hayes,* 14 Abb. N. C. (N. Y.) 419; *Old Dominion Copper Mining Co.* v. *Lewisohn,* 210 U. S. 206, [52 L. Ed. 1025; 28 Sup. Ct. Rep. 634]; *Stratton's Independence Ltd.* v. *Dines,* 135 Fed. 449, [68 C. C. A. 161]; *In re Ambrose Lake Tin & Copper Mining Co.,* 14 Ch. Div. 390; *Seymour* v. *Spring Forrest Cemetery Assoc.,* 144 N. Y. 333, [26 L. R. A. 859, 29 N. E. 365]; *Tompkins* v. *Perry, Jones & Co.,* 96 Md. 560, [54 Atl. 254]; *Woodbury Heights Land Co.* v. *Loudenslager,* 55 N. J. Eq., 78, [35 Atl. 436].

We will not particularly discuss these authorities. They undoubtedly sustain the contention of the appellants if the case made under the findings is the case they claim is shown therefrom. These cited cases were all cases, or principally such, where all the stockholders of a corporation turned over property to it at an excessive valuation, receiving in payment therefor shares of its capital stock based upon such excessive valuation and where these stockholders acquired the shares issued or participated in the profits derived from the transaction. There were no other stockholders or subscribers to the stock, nor was it contemplated that others should become future purchasers from the corporation of its stock, nor, in fact, were there any persons at all interested in the corporation or the transaction had with it save these stockholders participating in the transaction. Subsequent to the issuance of the stock to these participating stockholders they sold it to third parties and actions were brought by the corporation in behalf of such subsequent purchasers on the theory that the corporation itself was defrauded through the original transaction. It was held that as the corporate entity at the time of these transactions consisted of these stockholders all participating in the transaction, the corporation

had consented to it with full knowledge of the facts and no fraud was committed on it of which the corporation itself could complain. But we do not think the rule of these authorities has any application to the case made out by the findings here which we do not agree is the case counsel for appellants assumes is made. The findings in our view make quite a different case to which other principles than those contended for by appellants are to be applied. We will state those principles first and subsequently apply them to the true case we consider is made under the findings. Premising, it is to be observed that in the transactions with reference to the purchase of this property by Manson from Mrs. Wright to be thereafter transferred to a corporation to be organized for that express purpose, Manson occupied the position of a promoter of the enterprise, associating with himself the Chicago parties to jointly carry out these purposes. By reason of this association and mutual co-operation a fiduciary relation was created between Manson and said associates and if it can be said under the facts found that that fiduciary relation governed and controlled the conduct of Manson in securing the mining property, the organization of the plaintiff corporation to take it over and his transactions with the latter respecting it, we think, applying the principles to be referred to, a fraud was committed by him upon the corporation itself warranting it in the maintenance of this action; assuming for the present that the other finding of the court against the validity of the trust-deed note to Walls is sustained by the evidence.

In this court, in *Lomita Land and Water Co.* v. *Robinson,* 154 Cal. 36, 18 L. R. A. (N. S.) 1106, 97 Pac. 10], the principle is laid down that "promoters of a corporation formed for the express purpose of purchasing a particular piece of property occupy a fiduciary relation to their co-subscribers, and are bound to truthfully declare to their associates any personal interest they may have in the matter of the purchase. Without such disclosures they cannot legally profit at the expense of their associates, and if they were guilty of any misrepresentations of facts or suppression of truth in relation to their personal interest in the proposed purchase, the corporation is entitled to set aside the transaction, or recover compensation for any loss which it has suffered." And in *Burbank* v. *Dennis,* 101 Cal. 90, [35 Pac. 444], it is said:

"The substance of the law is that promoters are corporate fiduciaries. Transactions with their companies wherein they deal honorably, with full disclosure, and without seeking to influence the action of the corporation, will be upheld. But transactions in which they suppress or misrepresent material facts, or otherwise deceive the company, or corruptly control its action, are fraudulent, and the company may either elect wholly to set aside such transactions, or to recover the promoter's profits."

Thompson in his work on Corporations, section 457, speaking with reference to secret profits of a promoter, says: "Promoters of a corporation occupy a fiduciary relation to it and have no right to derive any advantage over other stockholders, without a full and fair disclosure of the transaction; and any secret profits which they acquire through promoting the corporation must be refunded, and may be recovered in equity by the corporation or its legal representative, and in many cases at law. Persons who organize a corporation for the purpose of working certain property are bound to disclose to persons who may be by them induced to join them in the company, what the vendors of the property actually receive for it; and if, by deceiving the members of the company as to the actual price paid for the property, or if, by collusion with the vendors they are permitted to retain for themselves a portion of the purchase money, they must account to the company for the same in equity; or the company may maintain an action in *assumpsit* against them for the moneys so secretly reserved to themselves, as so much money had and received to its use. In like manner, persons who purchase property and then organize a company to purchase it from them, stand in a fiduciary position toward such company, and must faithfully state to the company all material facts relating to the property, which would influence the company in deciding on the desirability of purchasing it. In such cases the owners of property who desire to create a company for the purpose of purchasing it from them are bound, if they wish to make a contract which will stand, to nominate independent directors, and to disclose to them the actual facts. The principle upon which courts of equity proceed in these cases is a very familiar one. The promoter of a company, like its directors, is deemed to sustain toward the members of the company the relation of a trustee toward

his *cestui que trust*.   This being so, he will not be permitted to speculate out of that relation, or to derive secret advantages from it.   He is bound to disclose to them fully all material facts touching his relation to them, including the amount which he is to get for his services as promoter, usually called 'promotion money.'"   And continuing, the same author says: "This principle is undoubtedly applicable to promoters of a corporation not yet *in esse,* though it may be difficult in strict logic to work out such a case upon the theory that they are trustees for a body which is not *in esse* and which they are proposing to create.   Perhaps the conclusion is better worked out upon the reasoning of a recent writer of reputation: 'Before any shares had issued, the existence of the company was a fiction.   The shareholders really formed the company, each one becoming a member when he took his shares.   While the contract for the purchase of the property was nominally in force from the time of its approval by the board of directors, yet it really took effect only after the shareholders had taken their shares. It then became binding on all the shareholders collectively, or, in other words, on the company.   The fraud consisted in inducing the shareholders to enter into this contract in their collective capacity, and in using the funds belonging to the shareholders collectively in paying the purchase price. It is evident, therefore, that the injury to the shareholders was not an injury to the collective or corporate interests, and that the company was the proper complainant.'   It seems, however, that the case cannot rest upon the idea of two parties to a trade dealing with each other at arm's length.   While the promoters, at the time of making the offer, are not in a relation of trust and confidence with those to whom they make it, yet by the offer itself they propose to enter into such a relation with them; and this circumstance puts them under the same duty of making full and fair disclosures to them which they would be under if the trust relation had already been established. . . . The very suggestion made by associates to intending subscribers to the corporate shares: 'We are going to be your co-adventurers in this enterprise to be founded and prosecuted for the common profit of all,' implies an obligation on their part to deal openly and with the same fidelity which is demanded where a trust relation has been established."

These principles are enunciated and applied in adjudicated cases among others: *Simons* v. *Vulcan Oil & Refining Co.,* 61 Pa. St. 217, [100 Am. Dec. 628]; *Pittsburg Mining Co.* v. *Spooner,* 74 Wis 307, [17 Am. St. Rep. 149, 42 N. W. 259]; *South Joplin Land Co.* v. *Case,* 104 Mo. 572, [16 S. W. 390]; *Erlanger* v. *New Sombrero Phosphate Co.,* L. R. 3 App. Cas. 1218; *Colton Imp. Co.* v. *Richter,* 26 Misc. Rep. 26, [55 N. Y. Supp. 486]; *Walker* v. *Pike County Land Co.,* 139 Fed. 609, [71 C. C. A. 593].

In *South Joplin Land Co.* v. *Case,* just cited, the court said: "Persons who take an active part in procuring subscriptions, and in organizing a corporation or company, called 'promoters,' occupy a position often difficult to define. When the owner of the property deals with those promoters, representing himself only, it is very clear he occupies no position of trust or agency. He may deal at arm's length, as in other cases, being liable, however, for his fraudulent conduct. But it is common practice for persons who own property, or who have acquired the right to purchase property, to project and form a corporation, and induce others to become stockholders for the purpose of selling the property to the corporation at a profit. . . . But the persons who thus project and form a corporation, by soliciting and procuring others to subscribe for and take shares of stock, for the purpose of selling or turning over to the company property which they own, or have a right to acquire by executory contract, do occupy a double position. On the one hand they represent their own interest in respect to the disposition of the property; on the other, they represent the proposed corporation. Any persons who subscribe for stock have a right to do so upon the assumption that the promoters are using their knowledge, skill, and ability for the benefit of the company. It is, therefore, clear on principle that promoters, under the circumstances just stated, do occupy a position of trust and confidence, and it devolves upon them to make full disclosure. . . . So it has been said in this country: 'The second principle is that where persons form such an association, or begin or start the project of one, from that time they do stand in a confidential relation to each other, and to all others who may subsequently become members or subscribers; and it is not competent for any of them to purchase property for the purpose of such a company, and

then sell it at an advance without a full disclosure of the facts. They must account to the company for the profits, because it legitimately is theirs.' (*Densmore Oil Co.* v. *Densmore*, 64 Pa. St. 43-50.) . . . The point of most difficulty in this class of cases is as to the time when this fiduciary relation arises. As to this it has been well said: 'On the one hand it is quite plain that a fiduciary relation between a promoter and a company may exist long before the actual formation of a company by registration or otherwise. On the other hand, it is obvious that something must be done beyond a purchase and resale to constitute such relation— something must, it is submitted, be done by the promoter to impose upon him the duty of protecting the interests of those who ultimately form the company. He assumes this duty if he assumes to act for them, or if he induces them to trust him, or to trust persons who are under his control, and who are practically himself in disguise. He also assumes such duty if he calls the company into existence in order that it may buy what he has to sell; but he does not assume such duty by negotiating with persons who have themselves assumed that duty, and who are in no way under his influence. (1 Lindley on Partnership [4th ed.] 584).''

At this point and without discussing now the true relations between Manson and the Chicago parties in the entire transaction relative to the organization of the corporation and acquirement by it of this property, it is to be observed that by the antecedent oral agreement and understanding between Manson and the Chicago parties and by the terms of the written contract between them it was contemplated and intended that in the organization of the corporation future stockholders should be brought in; that treasury stock to the amount of 150,000 shares should be issued to Brown as trustee of the corporation to be sold to third parties for the benefit of the corporation at prices and terms set out in the contract, and another 150,000 shares were to be held by the corporation as a fund for its future use which, of course, involved a right in the corporation to sell it to future stockholders. There were then 150,000 corporate shares which the agreement expressly provided should be sold to constitute future stockholders in the corporation and 150,000 shares additional subject to sale for such purpose; an agregate of 300,000 shares, or three-fifths of the capital stock of

the corporation. Brown actually did sell a very large portion of this treasury stock pursuant to the agreement. When in the promotion of a corporation to take over property for the benefit of the corporation it is contemplated by those organizing it that shares of its stock shall be offered for sale in order that others may become future stockholders in the corporation, such promoters in dealing with the corporation occupy a fiduciary relation to it for the benefit of such future stockholders and the interests of such future stockholders are entitled to protection from concealed benefits or profits acquired by the promoters in their transactions with the corporation and to a full disclosure of the true facts of the purchase price of the property turned over to the corporation and any advantage or benefits accruing to the promoters by failure to do so or concealment constitutes a fraud on the corporation. This principle is announced in *Western State Life Ins. Co.* v. *Lockwood,* 166 Cal. 185, [135 Pac. 496]. That case involved the right of a corporation to sue its president for a profit obtained where under the organization of the corporation the taking in of future stockholders was directly contemplated. We quote only from that decision as declaring the principle under such circumstances. The court said: ''The very first duty of the directors of this corporation was to procure the necessary stock subscriptions to enable the corporation to commence and continue its business. They accepted this trust when they assumed the office of directors, and in the discharge of this trust they were practically 'promoters' of the corporation. The obtaining of such subscriptions was practically a part of the formation of the company. One who engages in such work is known as a promoter, and is subject to the obligations imposed upon promoters. (Citing cases.) As said in 1 Thompson on Corporations, sec. 415, the word 'promoter' 'involves the idea of exertion for the purpose of floating a company, and also the idea of some duty toward the company imposed by, or arising out of, the position which the so-called promoter assumes towards it. It is thoroughly settled that promoters cannot make a secret profit out of the corporation—that they occupy a fiduciary relation to it, and to its stockholders and have no right to derive any advantage over other stockholders without a full and fair disclosure of the transaction.' ''

In the application of these principles there is no distinction between promoters of a corporation and its president or directors. In the case just quoted from this court quotes with approval the following from *Bennett* v. *Havelock Electric Light etc. Co.,* 21 Ont. L. R. 120: "It has been argued in this case that the defendants are not liable, as they were in fact the only shareholders of the company at the time of the transaction, and because they, as shareholders, assented to what was done. This ignores the fact that, when there is intended to be an invitation to others to come in and take stock, the future shareholders are entitled to the protection of an absolute independent directorate and to full disclosure of the actual facts. There is no distinction between the position of promoters and directors in this respect; if any can be drawn, it must impose a more stringent obligation upon one occupying the position of director. The principles laid down in the decided cases accord with the dictates of honesty and fair play." (See, also, *Erlanger* v. *New Sombrero Phos. Co.,* L. R. 3 App. Cas. 1218; *Colton Imp. Co.* v. *Richter,* 26 Misc. Rep. 26, [55 N. Y. Supp. 486]; *Camden Land Co.* v. *Lewis,* 101 Me. 78, [63 Atl. 523]; *Pietsch* v. *Millbrath,* 123 Wis. 647, [107 Am. St. Rep. 1017, 68 L. R. A. 945, 101 N. W. 388, 102 N. W. 342].)

Having set forth these principles we come now to a consideration and application of them to the facts found, and as we deem the true case is presented under them. It is not simply a case, as claimed by appellants, where an owner of property offers to transfer the property to the corporation for all its stock and where in the transaction no one save himself as the owner of all the stock and property transferred for it is interested or to be considered. This was not the real or true situation shown by the findings. The case presented is in reality one where a promoter associates and co-operates with others in the organization of a corporation for the express purpose of having it take over certain property under the control of the promoter at its actual cost, it being intended and contemplated that in the organization of the corporation all those associated are to become stockholders in it and other stockholders are to be invited to take stock in the corporation and where, in the transactions with the corporation so organized, the promoter makes a concealed profit on the transfer of the property to it. It is true that upon the organi-

zation of this corporation the form of the transaction respecting the transfer of the property to it was one between Manson as owner of all its stock and himself as having received in effect an option on the mining property transferred by him to it. The mere form, however, which the transaction between Manson and the corporation took may not be interposed to defeat what was the evident purpose and intent of all the parties interested in the organization of the corporation and the acquirement of the property by it. The court will look beyond the form which the transaction took and to its substance and the obvious intent of the parties in the entire matter for the purpose of preserving and securing the rights of the real parties in interest and to circumvent fraud. That a fiduciary relationship existed between Manson and the Chicago parties, his associates, at least prior to the actual organization of the corporation, in their mutual endeavor to promote its incorporation for the express purpose of taking over this property at the lowest figure at which it could be obtained as represented to his associates by Manson, and that the Chicago parties should finance the corporation and all parties be stockholders therein, is beyond question. But it is said by appellants that whatever fiduciary relation may have existed between Manson and these associates prior to the organization of the corporation, none existed between him and the corporation itself in the actual transaction respecting the transfer by him of the property to the latter. But this claim is not sound when the real situation is considered; the relation in which Manson and the associates stood to each other during the entire transaction both as to the organization of the corporation and the purchase by it of this property and in which it was contemplated they should all stand to the corporation upon its organization. Under the authorities which we have quoted the fiduciary relation of a promoter of a corporation to the corporation to be organized may exist long before its actual organization. As it may, so then, we are satisfied that in the transactions here involved between Manson and the corporation it did exist. While by the terms of the contract of January 7, 1907, it was agreed by all the parties that the actual organization of the corporation should be left to Manson and all the stock be issued to him, it is apparent that this plan was determined on simply as a convenient

method of effecting a transfer of the property to the corporation. The obvious purpose of the agreement with reference to the issuance of capital stock of the corporation to him was in reality to make him simply a transferee for the benefit of the Chicago parties, his associates in its organization, as to a large portion of its stock and as to a larger portion thereof he was simply a medium through which it should be redelivered to the corporation to constitute its treasury stock to be disposed of to future stockholders to be brought into the corporation. In fact, as is apparent from the terms of the contract itself, as well as the previous negotiations had between these parties, this was the entire purpose to be achieved through the organization of the corporation. Considering the relation of Manson to his associates from an equitable point of view, they were all to be considered as stockholders during Manson's negotiations with the corporation respecting the transfer of this property to it, notwithstanding that he was nominally the owner of all the stock. While nominally issued to Manson the stock was in reality acquired by him to a large extent for the benefit of his associates as intended stockholders with him in the corporation and still larger for the immediate benefit of the corporation as treasury stock to be sold to future stockholders. Very little of this stock was intended to be held by Manson himself. His prime interest in forming the corporation was to have it take over the property at a concealed and excessive valuation over its true price as represented by him; his associates and future stockholders to float and finance the corporation. Necessarily, as the scheme of the organization of the corporation contemplated, those who were to be the actual holders of this stock —the Chicago parties and purchasers of treasury stock of the corporation—were to contribute to its treasury the funds to make payment of the notes issued as the purchase price of the property and to the extent that these stockholders, through the fraudulent conduct of Manson, were injured, it was an injury to the corporation as representing their collective or corporate interests. This being the true relation of the parties, the duty of Manson to his associates as equitably constituting with himself stockholders in the corporation, as well as to the future stockholders which it was contemplated should be brought in, required the utmost good faith in his transactions with the corporation. Such

duty toward it required that he should make no secret profit by misrepresenting the price to be paid for the property which he was to transfer to it. In disregard of this duty and having by a violation of it fraudulently secured an unjust advantage in the transaction, the corporation had a right to maintain this action in all respects as it was brought, and particularly as far as its outstanding obligation repre-. sented by the trust-deed and the note to Walls is concerned, to have them set aside as representing an unjust gain of Manson unless, as contended by Walls, he·was a purchaser in good faith and indorsee before its maturity of the original note to Manson of which the trust-deed note is a renewal.

Now, as to the finding that Walls was not a purchaser or indorsee for value before the maturity of this original note of April 5, 1906. Appellant claims that this finding is not sustained by the evidence.

Fraud in the inception of the original note in suit being shown the burden was cast on Walls of proving that he was an innocent purchaser or indorsee of the note for value before maturity. (*Eames* v. *Crosier,* 101 Cal. 260, [35 Pac. 873]; *Sinkler* v. *Siljain,* 136 Cal. 356, [68 Pac. 1024].) That Walls was not such a purchaser or indorsee before maturity or at all, the court was warranted in finding on the testimony of Walls himself as to the details of the transaction under which he claims to have purchased it, without any consideration of other evidence which was given in the case tending to negative it. Manson and himself had been for years associated together in the "bucket shop" business and dealing together in stock speculations; their relations were very close and intimate; and they had many business transactions in common and trusted each other implicitly. As to the purchase of the original note Walls testified that shortly prior to April 5, 1906, he called on Manson about investing some money and Manson told him that he had this original note for one hundred thousand dollars falling due on the 5th of the month which he would sell him for its face value and on Manson's simple assurance that it was a safe purchase he agreed to take it. Walls did not see the note or know where it was. Manson wanted the full face value of the note as the purchase price payable at once or at the latest the next day. Walls testified that on the following day he got from his wife forty-seven thousand· dollars of some

seventy-two thousand dollars or seventy-three thousand dollars in currency which for a long time had been kept in their house in a hardwood cedar chest, and fifty-three thousand dollars in currency which he took from his safe deposit box in a bank and forthwith paid Manson this money for the note. Manson then told him he did not think the original note would be paid at maturity, but that a new note would be issued in place of it to bear eight per cent interest. The original note bore no interest. After paying the money Walls told Manson to take charge of the original note. Later Manson told him that the original note had not been paid and that he was going to give him a new note of the corporation signed by himself as president and by the secretary of the corporation. This he did, it being the trust-deed note here involved. This trust-deed note Walls did not put into any bank or safe deposit box, but carried in a wallet in his pocket for seven or eight months. He was not present when this renewal note was made out; that matter was attended to by Manson. Walls was not engaged in the business of buying notes or mortgages and bought no other notes. The original note he claimed to have purchased he never had in his possession. Manson retained it. Manson did not testify on the trial though he was accessible as a witness. Neither did the wife of Walls.

This narrative of Walls as to the circumstances surrounding the purchase of the original note was not such as to impress a court with a conviction that it was true. The trial court was not so impressed, and that court cannot be said to have fallen into any error in treating his story as incredible. While the general rule is that the uncontradicted testimony of a witness cannot be disregarded by a court, still this rule is subject to limitations. And where the testimony of a witness, though of a most positive character, is yet so improbable when tested by rules which govern men of ordinary capacity and intelligence in a given business transaction, a court may refuse to credit it. (*Davis* v. *Judson,* 159 Cal. 121, [113 Pac. 147].)

Aside from the unusual circumstances of a sensible business man keeping a small fortune in currency in a wooden chest in his house, there are other circumstances impairing the credibility of the story of Walls. He was paying a large sum of money for this note and it does not appear that he

was a man of such wealth that whether he was making a judicious and safe investment was a matter of business indifference to him. According to his story, however, this would appear to be the fact. He knew nothing about the property of the plaintiff corporation or its financial resources or responsibility. He did not inquire as to its indebtedness by which he might have ascertained that there was a note for one hundred thousand dollars prior to that which he claims he was purchasing which the corporation had not yet paid. In fact, he made no inquiries at all about the matter. His story summarized, shows that he bought a note for one hundred thousand dollars made by a corporation of which he knew nothing; a note which drew no interest and which might not be paid. He could derive no benefit from the transaction unless he purchased the note at a discount which he testified he did not. After the purchase he paid no further attention to the matter, leaving it all to Manson. He did not even obtain possession of the original note and never did have it, and according to his own statement, in the interim between paying Manson the money and receiving the trust-deed note, Manson had the original note and his one hundred thousand dollars, and he had no receipt or any other writing to protect his interest should anything have happened. There were no witnesses to the transaction, no book entries by either of the parties, no receipts or memorandum, no bank account or other account of Walls showing that his funds had been decreased through payment of this one hundred thousand dollars. In fact, the transaction was so apart from the ordinary course of business as to warrant the court in concluding that the story of Walls was a fabrication and entitled to no credence, and that he was not a purchaser or indorsee of the original note of April 5, 1907, before maturity, or at all.

As to the attack upon the judgment against Manson it is sufficient to say that Manson has not appealed from the judgment and, hence, the validity of the judgment against him is not before us for determination.

The judgment and order appealed from are affirmed.

Shaw, J., Sloss, J., Melvin, J., Henshaw, J., and Angellotti, C. J., concurred.