GOODSPEED v. LAW.*

(Circuit Court of Appeals, Ninth Circuit. September 8, 1919.)

No. 3303.

1. CORPORATIONS ⊗⇒221 — THOUGH FRAUD WAS SHOWN IN ORGANIZATION, RIGHTS OF PARTIES AS TO NOTES EXECUTED WILL BE DETERMINED.

Where there was fraud and misrepresentation in an agreement providing for the forming of a corporation, the fact that the corporation was organized and executed its notes in accordance with the agreement will not prevent a court from adjudicating rights as between the parties themselves, independently of the corporation.

2. PRINCIPAL AND AGENT ⊗⇒175(2)—BANK RATIFYING ACT OF AGENT AFFECTED BY HIS FRAUD IN TRANSACTION.

A bank, which took as collateral to a note a contract by which a sum was to be paid the debtor in 30 days, and appointed the debtor its agent to collect, and afterward accepted in place of the contract notes of a corporation formed under a substituted contract made by the debtor, *held* to have ratified the acts of its agent in making the substitution, and to be affected by his fraud in the transaction, which invalidated the notes as between the parties.

3. PRINCIPAL AND AGENT ⊗⇒172—RATIFICATION OF PART OF UNAUTHORIZED ACT OF AGENT RATIFIES THE WHOLE.

If a principal elects to ratify any part of the unauthorized act of his agent, he must ratify the whole.

In Error to the District Court of the United States for the Second Division of the Northern District of California; Frank H. Rudkin, Judge.

Action at law by Charles F. Goodspeed against Herbert E. Law. Judgment for defendant, and plaintiff brings error. Affirmed.

Edward C. Harrison and Maurice E. Harrison, both of San Francisco, Cal., for plaintiff in error.

Pillsbury, Madison & Sutro, of San Francisco, Cal., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Goodspeed, plaintiff in error and plaintiff below, brought this action to recover from the defendant, Law, upon a statutory liability as a stockholder in a California corporation, the Hydrox Chemical Company of the Pacific Coast, half of the amount of 17 promissory notes. The writ of error is prosecuted from a judgment entered in the District Court by direction of the court to the jury.

The plaintiff alleges the execution of 17 notes, negotiable in form, by Hydrox Chemical Company of the Pacific Coast, to be called the Pacific Coast Company, to the order of a New Jersey corporation, Hydrox Chemical Company, to be called the New Jersey company; that all these notes were transferred before maturity to Irving National Bank of New York, which bank transferred them to the assignors of the plaintiff, Goodspeed; that defendant, Law, was the owner and holder of half of the capital stock of the Pacific Coast com-

pany. The judgment prayed for was for half of the aggregate amount of the notes, or $4,250, with interest.

The defendant, Law, denied that he was the holder of stock in the Pacific Coast company at the time that the indebtedness upon the note was incurred, and set up affirmatively that he was induced to become a stockholder in the corporation because of certain fraudulent representations made to him by the New Jersey company and one Robert M. Hawk, and that the various holders of the notes, and especially the Irving National Bank, had notice of the fraud at the time of the taking of the notes. Goodspeed admitted that he held the notes as the agent for collection of the Irving National Bank.

The facts as admitted and clearly proved upon the trial were in substance as follows:

In May, 1915, and prior thereto, Hydrox Chemical Company, the New Jersey company, had a principal office in New York and an office in San Francisco, with Robert M. Hawk in charge. In May, 1915, Hawk, after negotiating with the New Jersey company, for the purchase of the San Francisco branch, made an agreement, dated May 17, 1915, wherein it was provided that the Pacific Coast company agreed to sell and Hawk agreed to buy, through the medium of a new company, the Pacific Coast company for $17,000. The agreement recited that $4,500 of the total purchase price had been received at the time of the execution of the contract, and that the balance of $12,500 should be paid as follows: $8,500 in cash within 30 days, and the remaining $4,000 in five promissory notes, maturing, respectively, at dates between December 1, 1915, and December 31, 1916. Hawk was to cause a new corporation to be organized, Hydrox Chemical Company of the Pacific Coast, and agreed to transfer to the new company his rights under the contract, and that the notes, aggregating $4,000, being the final payment under the contract, should be made by the newly formed company. The New Jersey company was also to receive 10 per cent. of the profits of the new company during the first five years of its operation. After May 17, 1915, Schuyler Lestrade, president of the New Jersey company, applied to the Irving National Bank of New York for a loan of $8,500. Lestrade showed Van Doren, the assistant cashier, the contract which had been made between Hawk and himself as president, and told Van Doren that the money to be borrowed would be repaid to the bank from the $8,500 payment which would become due under the contract within 30 days after the date thereof, which would be on or about June 17, 1915. The loan was arranged for, and the $8,500 borrowed from the bank was credited to the account of the New Jersey company, and a promissory note for $8,500, dated May 27, 1915, was made by the New Jersey company in favor of the bank, due 30 days after date; the terms of the note reciting that it was secured by collateral in the form of an assignment of the $8,500 payment to be due. The assignment, so made as collateral security, is as follows:

"For and in consideration of the payment of the sum of eighty-five hundred ($8,500) dollars to the undersigned, by Irving National Bank, New York, a national banking corporation conducting business in the borough of Manhattan, city of New York, the receipt whereof is hereby acknowledged, the un-

dersigned, Hydrox Chemical Company, a corporation organized under the laws of the state of New Jersey, does hereby sell, assign, transfer, and set over unto the said Irving National Bank, New York, all its right, title, and interest in and to the sum of eighty-five hundred ($8,500) dollars, to become due to the undersigned on or before the 17th day of June, 1915, from one Robert M. Hawk, pursuant to the terms of paragraph 8 of a certain agreement made the 17th day of May, 1915, between the said Hydrox Chemical Company and said Robert M. Hawk, and the undersigned does hereby agree to collect the said sum of eighty-five hundred ($8,500) dollars to become due to it under the contract hereinbefore mentioned, as the agent of the Irving National Bank, New York, but at the cost and expense of said Hydrox Chemical Company, and to promptly pay over the said sum to the said Irving National Bank, New York.

"In witness whereof, the said Hydrox Chemical Company has caused these presents to be subscribed by its president, and its corporate seal to be hereunto affixed, this 27th day of May, 1915. Hydrox Chemical Co., Schuyler Lestrade Pres. [Seal.]"

When the note of May 27th matured in June, it was not paid, and Lestrade told Van Doren that the $8,500 had not been collected. The note was renewed from time to time, and again on August 11, 1915, to mature on August 23d, but was not paid. Lestrade told Van Doren that they were trying to collect, and that J. W. Lestrade was in California representing the New Jersey company in trying to consummate the deal. On August 26th a new note for $8,500, due on demand after date, was made and accepted by the bank. This new note was secured by collateral in the form of notes, aggregating $3,500, made by R. M. Hawk individually, and also the promissory notes of the Pacific Coast company, all aggregating $11,500. Upon some of the latter notes this action is based. The notes were indorsed by the New Jersey company, payee, to Irving National Bank (on August 26, 1915), as security for the loan of $8,500, evidenced by the note dated August 23, 1915; the indorsements being made prior to the maturity of any of the notes in suit.

Upon the assumption that the foregoing facts show a transfer of negotiable notes to the bank before maturity and for value, we must look further into the facts as bearing upon the question of fraud and the knowledge of the bank. After the contract of May 17th between Hawk and the New Jersey company was made, Hawk signed another agreement with the New Jersey company, wherein he recited that he owed the New Jersey company $3,500, and, desiring to satisfy the debt, agreed to pay the company $3,500 in several payments, and deposited as collateral $3,500 of the capital stock of the proposed Pacific Coast company, and also sold and assigned 45 shares of the New Jersey company held by him. The evidence is that Hawk never owned any stock in the New Jersey company, and never paid anything in cash in connection with the sale of the business provided for by the agreement of May 17, 1915. Hawk returned to San Francisco, and in efforts to enlist financial interest wrote to Law on July 31, 1915, stating the substance of his agreement with the New Jersey company, and that he had paid $4,500 on account of the purchase price, proposing a new corporation, of which Hawk should receive 100 shares for the $4,500 he had paid out, and that Law should buy 100 shares for $4,500, and 50 shares should remain in the treasury. Law "accepted"

this proposal. Prior to this, and about June 22d, J. W. Lestrade, father of Schuyler Lestrade, president of the New Jersey company, came to San Francisco with power to act for the New Jersey company. Law testified:

That at a meeting with Lestrade and Hawk, about July 30, 1915, "they stated that the business had net assets of $11,000; that the bills payable and receivable about offset each other; that the business was earning $6,000 a year; and Mr. Lestrade produced a letter and read it, in which they said that the process had been changed, and that the business would then earn $12,000 a year, assuming that there was no increase of business. Mr. Hawk said that the business would increase at least 50 per cent., and they figured the probable profit and discussed the advantages of the business, covering that afternoon and that evening and the next afternoon. That was on July 31, 1915. Mr. Lestrade and Mr. Hawk repeatedly emphasized the fact that I should pay cash to these people for their good will, and I did not want to do that. They said that the business earned enough to pay it, and I suggested that would be the best way to do; and they urged then, in view of the fact that Hawk had paid $4,500, I should at least pay him that much. Hawk said that was all the money he had in the world, and that the business would certainly be even more than calculated, and as an evidence of his confidence he had operated it for a year, and he had put every dollar he had in it, and had taken a chance of taking somebody else to join him. Mr. Hawk was then manager of the San Francisco branch. At that time Mr. Lestrade produced a letter, of which he read a part to me. The part which he read to me was upon the subject of increase of earnings that would accrue upon the change of the process. He did not leave the letter with me, nor did I read it, nor was there anything which he read to me with respect to Mr. Hawk. * * * He extolled Mr. Hawk in his ability and his judgment, and what a fine man he was, and what a splendid opportunity it was, and how dependable the business would be in his hands. At that time I did not see the agreement of May 17, 1915 (Plaintiff's Exhibit 21). It was not shown to me at that time, and I have never seen it until now. Nothing was said at that time with reference to there being any other agreement than the agreement of May 17, 1915, which purported to sell the business to Hawk for $17,000, and purported to show that $4,500 had already been paid, and nothing was said about that not being the only agreement between the parties. As the result of this conversation, I finally agreed to become interested in the matter as expressed in the agreement of July 31st."

When Law agreed to take an interest, the paragraph of the agreement between Hydrox Chemical Company and Hawk, dated May 17, 1915, relating to payment, was amended by reciting that, $4,500 having been received, there remained $12,000 to be paid as follows: $500 cash, and $12,000 in sums of $500 per month, beginning with October 31, 1915. It was also agreed that the New Jersey company was to receive 5 per cent. of the net profits of the new corporation for five years, and that the time of the contract should be extended, so as to enable the new company to form a corporation and carry out its obligations. This agreement was signed by Hydrox Chemical Company, J. W. Lestrade, and Robert M. Hawk. Law said that he believed the representations made to him, and relied upon them in entering into the arrangements, and said:

"I would not have entered this agreement, if I had not believed and relied upon each and every one of those representations."

Thereafter experts examined the books and found that the Pacific Coast company owed the Wells Fargo Bank $2,000, and Law testified

that he then first learned that the $4,500 had not been paid by Hawk, and that the business, instead of making $6,000 or more per annum, had lost approximately $6,000 during the current year. Law called upon Hawk and told him of the discoveries, and that he would have to adjust matters. Hawk said he would telegraph and have the New Jersey people rescind the agreement and make it right. Law testified that Hawk suggested the possibility of a mistake in the books, and asked that a certified accountant be appointed; that thereupon certified accountants were appointed, and made the same statements as had previously been made; that thereupon Hawk telegraphed to the New Jersey company (September 18, 1915), informing Lestrade that the books did not bear out the statements which they—Hawk and J. W. Lestrade—had made to Law, and that his own investigation convinced him that Law's demand for "cancellation of contract and return of notes" should be complied with, and that suit would be commenced unless action was had immediately. It appears that the New Jersey company did nothing about the matter, and the corporation went into the hands of a receiver. Law surrendered his stock to the company, but never received anything for $4,500 in cash which he had put in.

About November 26, 1915, the Irving Bank telegraphed to Law that it was the owner of the notes and wished payment. Law replied that he was not a stockholder of the Hydrox Chemical Company when the indebtedness was incurred. Thereafter, on December 6th, the bank was notified that the notes had been obtained through fraud, and was warned not to transfer them to a bona fide holder. The San Francisco business was later sold out by the creditors, and matters ran along until about November 20, 1916, when the bank, having announced that it would sell the notes at auction on November 22d, was notified by the Pacific Coast company, through its attorneys, that it protested against the sale of the notes upon the ground that the notes had been executed and delivered through fraud and fraudulent representations. On November 22, 1916, all of the notes of the New Jersey company were sold by the bank at auction for $30, and all of the Hawk notes, aggregating $3,500, were sold for $15.

Law testified that it was not until January or February, 1917, that he discovered the document of May 27, 1915, and the fact that the Hydrox Chemical Company had been acting as the agent of the bank, and that the $4,500 had not been paid. Schuyler Lestrade, president of the New Jersey company, testified that when the $8,500 note became due, on August 11, 1915, he called upon Mr. Van Doren, of the bank, and showed to him the agreement signed by J. W. Lestrade, representing the New Jersey company, and Hawk, with Law as a witness, and stated that the notes covering the payment would be received when the charter of incorporation of the Pacific Coast company was issued. He testified that he explained the situation in detail to Van Doren and told him of Law's interest in the matter. He also said that between August 21st and 23d he received a telegram from Hawk that the notes of the Pacific Coast company had been mailed, and that before August 23d he showed this telegram to Van Doren and asked him to hold the $8,500 note due August 23d, until the notes arrived; that on August

25th or 26th he received the 17 notes made by the Pacific Coast company, which are the notes in suit, and delivered them to Mr. Van Doren on August 26th as collateral for the loan. Van Doren testified that, if he had known of the facts on May 27, 1915, he would not have loaned the $8,500; that he would not have loaned the money if he had not thought that the $4,500 would be paid in cash. He said that on August 11th he told Lestrade that he was very much surprised to find that the payment of $4,500 had not been made, and that he had been deceived. At that time, August 11th, Van Doren read the amendatory agreement and the letter of July 31st from Hawk to Law, "accepted" by Law, setting forth the matter of the proposed corporation, and that Hawk had paid $4,500 on account of purchase. It is evident that Van Doren then knew that the parties must have been deceiving Law with respect to the payment of $4,500, as they had deceived him with respect to such payment. Notwithstanding this, however, he concluded to accept the notes of Hawk for $3,500 as additional security for the $8,500 indebtedness due August 11th.

While these things were happening in New York, the new corporation was being formed in San Francisco. The notes were issued by the new concern, and Law became a stockholder following the arrangements made on July 31, 1915. Van Doren says that he saw the telegram from the Pacific Coast company stating that the "deal" was "all completed" and that the notes here involved had been forwarded to New York; and of course he knew of the delivery to and acceptance of the notes by the bank, in addition to the notes of Hawk, as collateral security for the note for $8,500. No new money was advanced by the bank. The last note was a renewal of the note for the same amount which had been given on May 27, 1915, when the original loan was made.

The plaintiff states the material question to be whether fraud was practiced upon the defendant, and whether the Irving National Bank was a holder in due course of the notes in suit, and the specifications of errors are in the main predicated upon these points. The theory of plaintiff is that the defendant is liable under article 12, § 3, of the Constitution of California, which provides that a stockholder of a corporation shall be personally liable for such proportion of all of its debts and liabilities contracted or incurred during the time he was a stockholder, as the amount of stock or shares owned by him bears to the subscribed capital stock or shares of the corporation. Section 322 of the Civil Code of California also provides that a creditor of the corporation may institute joint or several actions against any of its stockholders for the proportion of his claim payable by each, and in such action the court must ascertain the proportion of the claims or debts for which each defendant is liable and render separate judgment against each in conformity therewith.

It being admitted that the Pacific Coast company on August 2, 1915, issued the notes set forth in the complaint, and it being alleged that at the time the indebtedness was incurred defendant held half of the capital stock of the corporation, namely, 100 shares, plaintiff by his

action seeks to hold him liable for one-half of the amount of the notes, together with interest.

In our consideration of the rights of the parties, it has become clear that Hawk and Lestrade represented that Hawk had paid $4,500 cash on the purchase price of the Pacific Coast properties, and that the business was earning $6,000 each year. Equally clear is it that the fact that the Pacific Coast company owed $2,000 to a bank in San Francisco was suppressed. The truth was that Hawk never had paid $4,500 in cash, and the business had never earned $6,000 per annum. These false representations were made by Hawk to Law, with the knowledge of and in the presence of Lestrade, Sr. Plaintiff did not call Hawk or Lestrade to contradict these facts. Law's testimony, however, was corroborated in several ways. As instances of corroboration, there is the agreement of July 31st, amending the original agreement; the amendment setting forth that $4,500 had been paid. Another instance is the letter written to Law by Hawk on July 31st, wherein Hawk wrote that he had paid $4,500 on account of the purchase price. There is also Hawk's telegram of September 18th to Schuyler Lestrade, advising him that the representations "upon which the trade was made," referring evidently in part to the profitable nature of the business, were untrue; also Hawk's telegram to Lestrade, dated September 20th, wherein he advised Lestrade that the representations to Law as to the business being profitable were untrue. But, furthermore, there is Van Doren's testimony that he had been deceived by the statement that $4,500 had been paid in cash, and his declaration that he would not have loaned the money if he had known the truth. We also have the evidence that Law, about September 18, 1915, within less than a month after he had become a stockholder, demanded a rescission of the plan and soon thereafter surrendered his stock.

[1] It is argued that it was incumbent upon Law to make independent investigations into the condition of affairs. But, if he had made such an investigation, it is doubtful whether he would have discovered that $4,500 had not been paid in cash; nor is it at all probable that he would have found from the books that $2,000 was owing to the Wells Fargo National Bank. But, aside from this, Law had the explicit letters of Hawk, written in June and July, not only stating figures, but inclosing statements of bills payable and receivable and stock on hand. Apparently he had no reason to doubt the integrity of Hawk, or to question the accuracy of the financial statements made by him. Spreckels v. Gorrill, 152 Cal. 385, 92 Pac. 1011; Macdonald v. De Fremery, 168 Cal. 189, 142 Pac. 73. Law testified very positively that he relied upon the representations, and but for them would not have gone into the transaction. As against his evidence and that in support of it, we think there was nothing of sufficient strength to justify a finding in favor of plaintiff below. Therefore, taking it as established that there was fraud and misrepresentation in the agreement, which provided for forming a corporation and executing the plan, the fact that a corporation was organized and that, when organized, the corporation issued its notes, will not prevent the court from

adjudicating rights as between the parties themselves independen'ly of the corporation. Cornell v. Corbin, 64 Cal. 197, 30 Pac. 629; California-Calaveras Mining Co. v. Wells, 170 Cal. 285, 149 Pac. 595.

[2] But, referring again to the agreement (already set forth) of May 27, 1915, between the bank and the New Jersey company, and to the evidence, it appears that no agreement was made between the bank and the New Jersey company, after the 27th of May, which changed the agreement of that date. It will be remembered that Lestrade, president of the New Jersey company, told Van Doren of the effort the company was making to collect the money, and that J. W. Lestrade, representative of the corporation, was in California and he thought would be successful. It was after the arrangements had been made with Law on July 31st, and after the papers which were then obtained had been taken to New York that Schuyler Lestrade called upon Van Doren and showed him the amendatory agreement and the letter, went over the situation in detail, showing him the changes which had been made in the original agreement, and what the corporation would do when formed. Van Doren recommended to Lestrade that indorsements should be made upon the notes, if possible; and it was after the formation of the corporation, and the issuance of the notes, and the delivery to the New Jersey company in New York, that the New Jersey company turned the notes over to the bank, which in turn accepted the notes in place of the $8,500, which it was to have received. When the bank made the New Jersey company its agent, it but established the relation which it meant to establish. The bank held the agreement of May 17th in a pledge relationship for the payment of $8,500, and it was proper that an agent should be designated to collect the money to be due under the agreement, and, as a business matter, that there should be no cost of collection accrue to the bank.

[3] Counsel for plaintiff put stress upon the contention that the only reasonable interpretation of the instrument of assignment or pledge is that the parties did not thereby intend to vest absolute ownership of the claim for $8,500 against Hawk in the bank, but only to create a lien thereon in its favor, and that the agency provision was meant, not to create the usual conventional relationship of principal and agent, but simply to make clear the duty of the pledgor to devote payment to the satisfaction of the debt secured. We are unable to sustain this view, for it conflicts with the usual rule that the intention of the parties must be gathered from the terms of the instrument they have made. Of course, the rule is subject to qualifications, and relationships between parties may be considered as an aid to interpretation, and a transfer absolute in form may be shown to be but a security. But there is no uncertainty or ambiguity in the instrument under consideration. The language is plain and simple, and the duty of the court in construction of the instrument is to declare what, in terms and substance, is contained in the writing. We are therefore forced to the view that the New Jersey company, as agent, obtained for the bank the promissory notes here involved, and the notes were

delivered to the bank, which now holds them and would impose upon the defendant liability under the stockholders' liability statute of California, notwithstanding the fact that it had full knowledge of all the material facts surrounding the making of the notes. The position of the bank, therefore, is like that of one who, upon discovery of the facts, holds onto a contract made by his agent, and asserts such rights as he may have arising from the unauthorized act of the agent. This he cannot do, for as long as he insists and relies upon the contract he cannot escape the consequences of ratification by showing that he was not fully informed of its terms and conditions. 2 C. J. 513. In La Grande National Bank v. Blum, 27 Or. 215, 41 Pac. 659, Judge Bean, speaking for the Supreme Court, said:

"No rule of law is more fundamental than, if the principal elects to ratify any part of the unauthorized act of an agent, he must ratify the whole. He cannot accept that part which is favorable to himself, and repudiate the remainder. As said by Mr. Justice Story: 'The principal cannot, of his own mere authority, ratify a transaction in part, and repudiate it as to the rest. He must either adopt the whole or none.' Story, Agency, § 250. And 'from this maxim,' says Chief Justice Smith, 'results a rule of universal application that, where a contract has been entered into by one man as agent of another, the person on whose behalf it has been made "cannot take the benefit of it without bearing its burdens. The contract must be performed in its integrity." ' Rudasell v. Falls, 92 N. C. 222. Indeed, reason, as well as authority, is all one way on this question. * * * Now, in this case, if the cashier of the bank exceeded his authority in making the contract with the defendants set up in the answer, and in accepting the note in suit, the plaintiff was not bound thereby; but it was bound to take the contract in its entirety, or not to recognize it at all. It cannot affirm that part of his act which is of advantage to it, and repudiate the rest." Johnston Harvester Co. v. Miller, 72 Mich. 265, 40 N. W. 433, 16 Am. St. Rep. 536; Wheeler & Wilson Manufacturing Co. v. Aughey, 144 Pa. 398, 22 Atl. 668, 27 Am. St. Rep. 638.

It is also argued by the plaintiff that it was error in the trial court to direct a verdict, even though the fraud pleaded by the defendant had been established as a matter of law by the proof, for the reason that, although Law was induced to enter into his contract of subscription by fraudulent statements, as alleged, nevertheless such fraudulent statements cannot constitute a defense to an action against a stockholder for a statutory liability on the notes. But, as our opinion is that the bank ratified the arrangements made by the New Jersey company by the acts done during August, 1915, we need not consider that question.

The judgment is affirmed.