ROBERT M. WELLS, Receiver,

*v.*

THE NORTHERN TRUST COMPANY *et al.*

*Opinion filed February 21, 1902—Rehearing denied April 3, 1902.*

1. MORTGAGES—*effect on railroad mortgage of provision of ordinance restricting right to dispose of franchise.* An ordinance granting a franchise to construct and operate an elevated railroad, which provides that the consent therein given shall never authorize another person or corporation to use the franchise, does not preclude the mortgaging of the company's property and franchise for the purpose of building the road, but, while such mortgage is not *ultra vires,* a purchaser at a foreclosure sale would, as to such franchise, acquire no right to operate the road without the consent of the city.

2. SAME—*when corporation and its stockholders are estopped to set up inequality of construction contract to defeat mortgage.* If all the persons interested in an elevated railroad company assent to a construction contract and its modifications, and to the execution of a mortgage and bonds in connection therewith, the corporation and all persons succeeding to the interests of the then stockholders are estopped to set up the inequality or oppressiveness of the construction contract to invalidate the mortgage and bonds.

3. BONDS—*breach of a construction contract cannot be set up to defeat title of bondholders.* Equities which an elevated railroad corporation may have against a construction company for breach of the construction contract cannot be set up to defeat the title of holders of bonds issued to carry out such contract.

4. JUDGMENTS AND DECREES—*when provision of a foreclosure decree allowing but ten days to pay money is not prejudicial.* A provision in a decree foreclosing a mortgage on the property of an elevated railroad company, requiring the payment of the amount due within ten days, or, in default of payment, that the property be sold absolutely, without right of redemption, is not prejudicial, where the sale is not made for nearly three months after the decree and is not confirmed until three months later, since the equity of the mortgagor is not exhausted until the sale is confirmed.

*Chicago, etc. R. T. R. R. Co.* v. *Trust Co.* 90 Ill. App. 460, affirmed.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

In March, 1888, the Chicago and South Side Rapid Transit Railroad Company was organized under the laws of Illinois for the purpose of constructing and operating an elevated railroad on the south side, in the city of Chicago. Its capital stock, amounting to $7,500,000, was divided into shares of $100 each and was subscribed for by six persons, five of them taking and paying for one share each and the remaining 74,995 shares being subscribed for by A. F. Walcott. March 10, 1888, the company entered into a construction contract with Walcott, by which he undertook to procure the right of way and to build and equip the road from VanBuren street to Sixty-seventh street, in consideration of which the company agreed to give him a receipt in full for his subscription to the capital stock, pay him $500 in cash and to give him $7,000,000 first mortgage bonds. This contract was subsequently assigned, with the assent of the company, to the Rapid Transit Construction Company.

March 26, 1888, the city council of Chicago passed an ordinance granting the company the right to construct an elevated railway within the city limits. Section 16 of the ordinance is as follows: "It is expressly provided that nothing contained in the foregoing ordinance shall in any way or manner be construed to permit the construction or operation of said elevated road in any street or alley of the city of Chicago, except to cross such street or alley, as herein above provided; and it is further provided that the above consent shall never, in any way or manner, authorize any other railroad company, or street or horse or dummy railroad company, to use the franchise herein above granted to said Chicago and South Side Rapid Transit Railroad Company; and it is expressly provided that nothing contained in this ordinance shall permit the said Chicago and South Side Rapid Transit Railroad Company to connect or operate its system with any steam surface railroad company,

nor shall the right of way or tracks of said Chicago and South Side Rapid Transit Railroad Company be used by the rolling stock of any surface steam railroad, for any purpose whatsoever." This ordinance was amended several times, but without changing or altering the effect of section 16.

October 1, 1890, a first mortgage was executed and delivered to the Northern Trust Company, as trustee, upon the first section of the road, from VanBuren street to Sixty-seventh street, to secure $7,500,000 in bonds, this action having been previously authorized by a unanimous vote of the stockholders. The trust deed recited that it was necessary to borrow money for the completion and equipment of said first section, and conveyed, in addition to said first section,—being about eight miles in length, with its tracks,—all personal and real property acquired or to be acquired for said first section, whether then owned or to be afterwards acquired, and all lands, buildings, rolling stock, equipment, franchises, privileges, rights, immunities, etc., accrued or to accrue to said first section, and all rents, issues and profits. It also contained a provision for declaring the bonds due in case of default in payment of interest for six months after demand.

The construction company proceeded to acquire the right of way and to construct the so-called first section of the road, but did not complete its contract, having become insolvent. About the middle of December, 1892, the railroad company made a settlement with the construction company, by which the latter was released from its contract upon its turning over the completed portion of the road, and certain tracts of land, of the estimated value of $1,000,000, which it had acquired with the proceeds of bonds and stock received under the construction contract. This land was not held or used for railroad purposes, and the title thereto was transferred to the Title Guarantee and Trust Company to be held in trust.

The railroad company, in making this settlement, assumed certain liabilities of the construction company, amounting to about $750,000.

In January, 1893, the railroad company executed and delivered a second mortgage or trust deed to the Northern Trust Company to secure the payment of $5,000,000 second mortgage bonds, of which only $3,000,000 were issued. This action was authorized by a vote of the stockholders for the purpose of raising money to finish the construction of the first section and to build the second section. This second mortgage covered the whole line, and included, in general terms, all lands, buildings, rolling stock, equipment, franchises, powers, rights and privileges appurtenant to the first and second sections, and all rights under the ordinances of the city of Chicago, subject, as to the first section, to the prior mortgage of October 1, 1889. The mortgage contained a provision for declaring the bonds due in case of default in payment of interest for six months after demand.

Default was made in the payment of the interest on the first mortgage bonds due in April, 1895, and in payment of the interest on the second mortgage bonds due in July, 1895. The Northern Trust Company was trustee under both mortgages, but, because of conflicting interests, resigned under the second mortgage on October 4, 1895, and the Illinois Trust and Savings Bank was on the same day appointed its successor. The next day the Northern Trust Company filed its bill to foreclose the first mortgage, there having been demand and six months' default thereafter. The Illinois Trust and Savings Bank, as trustee under the second mortgage, was made a defendant, and also the Title Guarantee and Trust Company. Upon the same day the Illinois Trust and Savings Bank, the second mortgage trustee, filed its answer, and also filed its cross-bill to foreclose the second mortgage pursuant to a resolution of the board of directors of the railroad company, waiving the provision requiring six

months' default and authorizing the trustee to act as though such default had occurred. The Title Guarantee and Trust Company was the holder in trust for the mortgagor of the land received in settlement with the construction company, which land, both in the original and the cross-bill, was alleged to have become, in equity, subject to the lien of the respective mortgages.

On June 29, 1896, a decree for the foreclosure of both mortgages was entered, directing the sale of all the property of the railroad company, including the real estate held by the Title Guarantee and Trust Company, also the franchises, rights and privileges under which the road was built, in default of payment, within ten days, of the amount found due, $11,400,707, and on September 16, 1896, the master sold the entire road, its franchises, lands, etc., for the total sum of $4,100,100, to George E. Adams and Leslie Carter, to whom a master's deed was made December 18, 1896. As to all the railroad property the sale was without right of redemption; on the lands acquired from the construction company the usual time of redemption was allowed. The decree of sale provided for notice of sale by three weeks' publication, the first publication to be not less than sixty days before the sale. When the master filed his report of sale September 28, the railroad company moved for further time within which to procure higher bids or pay the mortgage debts, but the court ordered the report confirmed, unless, within ninety days, either the whole debt or the whole of the second mortgage debt should be paid, or there should be bids at least six per cent higher than those originally made. December 29, 1896, the sale was made absolute. No appeal was taken by any party to the suit.

In the early part of 1897 the South Side Elevated Railroad Company was organized and acquired the railroad and other property purchased by Adams and Carter, and now owns and operates the road, and has expended more than $750,000 in betterments thereon.

December 12 and 13, 1898,—nearly two years after the confirmation of the sale,—certain stockholders, in behalf of themselves and of all other stockholders similarly situated, served notice on all the parties to the said foreclosure suit, with a demand that they, or some of them, should sue out a writ of error from the Appellate Court by December 22, 1898, stating that in default thereof they, as owners of over 12,000°of the 75,000 shares of the capital stock of the mortgagor railroad company, would apply for such a writ. They accordingly filed their petition for a writ 'of error in the Appellate Court, in the names of the Chicago and South Side Rapid Transit Railroad Company and the Title Guarantee and Trust Company, and made Adams and Carter, as purchasers, and the South Side Elevated Railroad Company, as present holder of the property, additional parties. The Appellate Court, upon the *prima facie* showing made, directed the writ to issue, intimating that the objections thereto could be brought up on a motion to dismiss, when the record and parties would be before the court. Motions to dismiss were made by the first and second mortgage trustees, the Northern Trust Company and the Illinois Trust and Savings Bank, and by the above named additional parties, also by the nominal plaintiffs in error, on the grounds that the issuance of the writ of error was in no way authorized by the nominal plaintiffs in error, that none of the stockholders were prejudiced by the foreclosure proceedings, and that a proper showing had not been made. After the cause had been submitted to the Appellate Court upon briefs, Robert M. Wells was appointed receiver of the Chicago and South Side Rapid Transit Railroad Company, and moved that he be permitted, as such receiver, to withdraw the motion theretofore made by said company to dismiss the writ of error, and for leave to assign the same errors as had been assigned by the petitioning stockholders, "to permit," as it was said, "the examination and decision of the case upon the

merits, without embarrassing the court with jurisdictional questions." The alleged errors in the record were considered by the Appellate Court upon the merits and the motion of Wells was allowed. The objection of the Title Guarantee and Trust Company to the use of its name as plaintiff in error without its consent, and the motion of the South Side Elevated Railroad Company for the dismissal of the writ upon the ground of *laches,* however, still remained. The decree of the circuit court was affirmed by the Appellate Court, from which judgment of affirmance the receiver has sued out a writ of error to this court. The petitioning stockholders have assigned as cross-errors the same errors assigned by the receiver.

EDDY, HALEY & MUNROE, for plaintiff in error.

DUPEE, JUDAH, WILLARD & WOLF, and WILSON, MOORE & McILVAINE, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

It is contended by counsel for the receiver that the mortgages executed by his company, the Chicago and South Side Rapid Transit Railroad Company, were made in violation of the limitations placed upon the company by section 16 of the ordinance of the city of Chicago, granting it permission and authority to construct, maintain and operate its road, and were therefore *ultra vires* and void, and that the company and its stockholders are not estopped from denying the same, and that the sale of the rights granted by the city in this ordinance should not have been included in the decree of sale. The part of the section bearing on this question is as follows: "The above consent shall never, in any way or manner, authorize any other railroad company, or street or horse or dummy railroad company, to use the franchise herein above granted to said Chicago and South Side Rapid Transit Railroad Company." It is contended that this

provision absolutely prohibits the railroad company from disposing, in any way or manner, of its right derived from the city to maintain and operate its road. Great stress is laid upon the proposition that this section was a limitation upon the powers of the railroad company, and took away the power granted to the railroad company by paragraph 10 of section 19, chapter 114, of the Revised Statutes, "to mortgage its corporate property and franchises to secure the payment of any debt contracted by such corporation for the purposes aforesaid," of completing, finishing, improving or operating its road. The case of *Tudor* v. *Chicago and South Side Rapid Transit Railroad Co.* 154 Ill. 129, (the receiver's company,) is cited as having settled this question in favor of the receiver's contention. That case arose under the eminent domain powers conferred upon the company, and the question there was whether the company could condemn a strip of land more than thirty feet in width, to which width the ordinance had restricted its right of way. It was there held that the city having the right, under the statute, "to provide for the location of any railroad," had the power to limit the width of the right of way, such limitation not being repugnant to the statutory provision that the width of the right of way should not exceed one hundred feet. It has also been held that cities have the right to stipulate for certain pecuniary returns in return for the license granted a railroad company to use their streets, (*Byrne* v. *Chicago General Railway Co.* 169 Ill. 75,) but we have been cited to no authority granting the city the right to abridge the statutory powers of a railroad company in the matter of mortgaging its road and franchises to secure the payment of debts contracted in building and equipping its road. The clause of the ordinance referred to does not, however, say that the company shall not mortgage or alienate its property, but only provides that the consent therein given shall never authorize any other railroad company to use the franchise therein

granted to the receiver's company.   In other words, the
license granted by the city is restricted specially to the
receiver's company.   The provision is for the benefit of
the city, to enable it to prevent any other company from
being its licensee without its express consent, and it en-
ables the city to impose any additional lawful burdens
upon any subsequent licensee that it may see fit to im-
pose.   There certainly is no prohibition herein against
mortgaging the property and franchises in conformity
to the statute.   If such mortgage should thereafter have
to be foreclosed, the purchaser at such sale would run
the risk of getting the city's consent to operate the pur-
chased property.   The inclusion of the rights granted
by the city ordinance in the decree of sale was inopera-
tive as to the further operation of the road by the pur-
chaser, as such rights were personal to the first licensee
and expired when its control terminated, and if there
was any error in including such rights derived from the
city, it was harmless.   The mortgages were not *ultra vires*
the corporation.   Taking the view of the case that we do,
the authorities cited by plaintiff in error are not in point.

It is further contended that the bonds secured by
the first mortgage, as well as the mortgage itself, are
void.   The basis of this contention is, that the construc-
tion company, to which the bonds and stock were issued
originally, received, under an amendment to its contract,
$15,000,000, half in stock and half in bonds of the com-
pany, while the building and equipping of the entire road
was only $7,728,102.94, including the second section, not
embraced in the original contract.   It is said that this
contract was so unfair as to be void, making the bonds
obnoxious to the constitutional and statutory provisions
that the fictitious indebtedness of a corporation shall be
void, even as to bonds in the hands of innocent purchas-
ers.   The contract with the construction company was
authorized by all the stockholders, and the mortgage
was authorized by the unanimous vote of all the stock

of the company. It is not shown that there were then any stockholders or creditors who were injured by this action against their consent. All then interested in the company having assented to the contract and its modification, and to the mortgage and the issuing of the bonds, the company and the successors in interest of the then stockholders are estopped from setting up the inequality or oppressiveness of the construction company's contract. (*Higgins* v. *Lansingh*, 154 Ill. 301.) The construction company became insolvent, and it was necessary for the railroad company to make a settlement with it so that it could finish the construction of its road. Any equities the company may have had against the construction company for the breach of its contract could not be interposed so as to defeat the title of the bondholders. *Peoria and Springfield Railroad Co.* v. *Thompson*, 103 Ill. 187.

It is further contended that the decree allowing ten days in which to pay the money found due, in default of which the whole property was to be sold absolutely, without right of redemption, was erroneous, as it allowed too short a time to bring into court such a large amount of money. In *Taylor* v. *Dillenburg*, 168 Ill. 235, it was said: "What is a reasonable time in which to redeem in cases of this character rests in the sound discretion of the court, in view of all the circumstances of the case." A reasonable time for the payment of the amount due has been variously estimated. In *Chicago, Danville and Vincennes Railroad Co.* v. *Fosdick*, 106 U. S. 47, and *Howell* v. *McAden*, 94 id. 463, a reasonable time to pay has been said to be ninety days or six months. It appears that the decree of sale, June 29, 1896, ordered the master to give at least sixty days' notice of the sale, and the sale in fact was made September 16, 1896, or two months and seventeen days after the entry of the decree. September 29 further time of ninety days was given before confirmation of the sale, which was not made until December 29, 1896. The equity of the mortgagor as against the mort-

gagee is not exhausted until sale actually confirmed, for if at any time prior he should bring into court for the mortgagee the amount of the debt, interest and costs, he will be allowed to redeem. (*Chicago, Danville and Vincennes Railroad Co.* v. *Fosdick, supra.*) The mortgagor was actually given six months in which to redeem, and no application was made for further time. In view of the subsequent proceedings, the error, if any, was harmless.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*