MARTIN HAYS *vs.* THE GEORGIAN INCORPORATED & others.

Suffolk. December 7, 8, 1931. — June 29, 1932.

Present: RUGG, C.J., PIERCE, WAIT, & FIELD, JJ.

*Equity Pleading and Practice*, Appeal, Bill, Demurrer. *Corporation*, Promotion, Reorganization, Officers and agents. *Fraud*.

Pleadings, decrees and papers on the files of courts are commonly to be interpreted in accordance with their true character without much regard to their name or title. Per RUGG, C.J.

Where, following the hearing of a demurrer to the bill in a suit in equity, there were entered an interlocutory decree sustaining the demurrer and subsequently a final decree dismissing the bill, a paper, filed by the plaintiff within twenty days after the entry of the final decree but more than twenty days after the entry of the interlocutory decree, with the caption, "PLAINTIFF'S APPEAL FROM FINAL DECREE," and a statement that the plaintiff appealed "from the final decree" "sustaining the demurrer," was interpreted by this court as an appeal from the final decree rather than from the interlocutory decree, so that it was filed seasonably and this court had jurisdiction to consider it.

Although promoters of a new corporation are fiduciaries with respect to it and are bound to use good faith in dealing with it, a minority stockholder of such a corporation could not maintain a suit in equity in its behalf against its promoters, who also became officers and directors of it, and against certain bankers, to recover for breaches of duty to the corporation by some of the defendants, where it appeared merely that the defendants entered into a scheme whereby the defendant promoters and directors caused certain property in which they were interested to be appraised at an excessive valuation and sold to the new corporation at that valuation and caused a large number of the shares of its stock to be issued in payment therefor; the bankers thereupon either purchased or underwrote the purchase of such shares from the directors for immediate resale to the public, thus enabling the directors to obtain unconscionable profits; and the bankers thereupon sold at a large profit a large part of such shares, and other shares which they obtained by purchase directly from the corporation, to the public without disclosure of the above facts and also with misrepresentations of certain facts, it not appearing that the bankers acted either as agents for the corporation or for the persons to whom they sold the shares.

The scheme pursued by the defendants, as above described, was not a fraud on the corporation nor did it render the defendants liable under the rule laid down in *Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 188 Mass. 315; 203 Mass. 159, because it did not appear that any of the shares immediately to be sold by the new corporation

upon its formation were intended to be sold, or in fact were sold, directly by the corporation to innocent initial subscribers without disclosure to them of material facts.

The bill in the suit above described was multifarious because the plaintiff, in addition to making allegations and seeking relief therein with respect to the defendants' scheme, also alleged that the defendant directors had voted themselves excessive salaries as officers of the corporation, and sought relief in that respect.

BILL IN EQUITY, filed in the Superior Court on September 30, 1930, and afterwards amended, described in the opinion.

The defendants demurred. The demurrers were heard by *Qua,* J., by whose order there were entered on June 23, 1931, an interlocutory decree sustaining the demurrers and on July 17, 1931, a final decree dismissing the bill. The plaintiff's appeal, filed on July 30, 1931, is described in the opinion.

*D. Stoneman,* (*R. Clayton* with him,) for the plaintiff.

*P. N. Jones,* (*D. Comins* with him,) for the defendants The Georgian Incorporated, and others.

*A. J. Santry,* (*R. Bancroft* with him,) for the defendants Lyman and another.

*M. Caro,* for The American Appraisal Company.

RUGG, C.J. This suit in equity is brought by the plaintiff, a minority stockholder, to recover in behalf of The Georgian Incorporated, for breaches of duty committed against that corporation by some of the defendants.

The case comes before us on demurrers to the bill. The substantive allegations of the bill are these: The defendants are The Georgian Incorporated, hereafter called the new corporation, The Georgian Inc., hereafter called the old corporation, four named individuals, hereafter called directors (who were the officers and directors of both the new and the old corporations, and who owned and controlled the old corporation), seven individuals, copartners in banking, hereafter called the bankers, and The American Appraisal Company, engaged in the business of appraising corporate properties. The old corporation, organized under the laws of this Commonwealth, was engaged in the restaurant business in several cities. While apparently prosperous, its real condition in December, 1926, was that it

had current liabilities of $504,202.79, current assets of $176,339.78, and fixed assets of $300,000. The directors, being in control of the old corporation, well knowing its precarious financial condition, conceived the scheme of organizing the new corporation for the purpose of selling the assets of the old corporation to it, and of selling through the medium of the new corporation large blocks of stock upon a basis which would enable (1) the old corporation to pay its debts, (2) the directors to recover sums invested by them in the old corporation, and (3) the directors to obtain large profits. To that end the directors entered into a combination and agreement with the bankers and the appraisal company (A) to appraise the assets of the old corporation at an excessive valuation, (B) to cause a sale of those assets to the new corporation, and (C) to cause the new corporation to issue preferred and common stock for resale to the public so as to accomplish (1) and (2) above specified and to yield to the directors and the bankers an unconscionable profit. The details of that combination and agreement as carried into execution are alleged to be of this nature: (a) The assets of the old corporation were appraised by the appraisal company at $1,123,600, a price, as it knew, far in excess of their real value, for the purpose of sale to the new corporation; and the net value of its assets after deducting its liabilities was then fixed by the directors at $783,985, an overvaluation of about $500,000. (b) The new corporation was then organized under the laws of this Commonwealth with a capitalization of 75,000 shares of Class A preference stock, each share of the par value of $20, and 2,000 shares of common stock, each share of the par value of $5. The directors were the executive officers and directors of the new corporation when first organized, and three of them were the original subscribers, each to one share of common stock. (c) The directors thereupon caused the new corporation to take over the assets of the old corporation and to pay therefor 38,750 shares of its Class A preference stock of an aggregate par value of $775,000, and 1,797 shares of its common stock of an aggregate par value of $8,985, being a total of $783,985.

Shortly thereafter, the directors caused the 2,000 shares of par value common stock to be changed into 100,000 shares without par value. Shares on this footing were issued to the old corporation in payment for the purchase of its assets, viz.: 38,750 shares of Class A preference stock and 89,850 shares of common stock. Each of the three shares of common stock issued to the original subscribers was exchanged for 50 shares. (d) Immediately upon the consummation of this sale, the old corporation distributed to the directors the stock received by it from the new corporation. Thus there were then issued and outstanding 38,750 shares of Class A preference stock and 90,000 shares of common stock of the new corporation, all in the hands of the directors. The balance of the authorized issue of stock of the new corporation was left in its treasury for the purpose of selling it to the public. Pursuant to the original plan the bankers agreed to and did purchase, or underwrite the purchase, from the directors, of the 38,750 shares of Class A preference stock received by them from the old corporation, actually paying therefor $775,000, and 25,000 shares of their common stock, paying therefor $25,000. The directors kept the aggregate of these sums, $800,000, for themselves. The bankers likewise agreed to purchase or underwrite 16,250 shares of Class A preference stock directly from the new corporation. These shares were in fact delivered by the new corporation to the bankers; they paying therefor to the new corporation $325,000. This sum was to be, and was actually, used to discharge to that extent the current liabilities of the new corporation, which were then in excess of that amount. (e) Shortly afterwards, the bankers, acting for themselves and the directors, solicited subscriptions from the public for 10,000 shares of common stock in the treasury of the new corporation at $14 per share. The averment further is that "the plaintiff is informed and believes, and therefore alleges, that the said 10,000 shares, or the major portion thereof, were subscribed for and sold to the public at $14 per share." As soon as this stock was subscribed for and before the certificates were delivered to the subscribers, the bankers received such stock through

the directors from the new corporation and paid therefor into its treasury $4 per share, or $40,000 in all. When subscriptions from the public were solicited, no disclosure was made to the public of any of the facts recited in the bill. The bankers and directors also sold to the public large blocks of common stock at $14 per share in addition to the 10,000 shares just referred to. The bankers offered for sale to the public 55,000 shares of Class A preference stock acquired by them from the directors and from the new corporation at $21 per share. There are further allegations of misrepresentations to the public by the bankers and directors as to the value of the assets turned over to the new corporation by the old corporation, as to the value of the stock, and in numerous other particulars. These representations are alleged in rather general terms. If described with sufficient particularity to constitute the basis of legal liability, they appear to be wrongs not to the corporation but to those who may have relied upon such representations to their harm. They relate mainly to methods used in selling the stock of directors and bankers. (f) The directors caused themselves to be elected officers of the new corporation and voted themselves unreasonably large annual salaries, far in excess of their real value, viz.: treasurer, $40,000; president, $30,000; vice-president, $15,000, and assistant treasurer, $15,000.

There are eleven prayers for relief, the substance of all being that the defendants be ordered to account to the new corporation for all money received by them in excess of the true value of the assets transferred to the new by the old corporation, whether from the sale of stock or otherwise, and for all profits received by them out of the several transactions; that the directors be ordered to account for all salaries received by them from the new corporation in excess of their true value, or that, in the alternative, relief be granted to the plaintiff in behalf of the new corporation by way of rescission, or part rescission and part damages.

The defendants demurred. All the demurrers were sustained on the grounds (1) that no cause of action was

stated, and (2) that the bill was multifarious. Interlocutory decree was entered sustaining the several demurrers on these grounds on June 23, 1931. A final decree was entered dismissing the bill, on July 17, 1931. The plaintiff claimed an appeal on July 30, 1931, in the following terms: "PLAINTIFF'S APPEAL FROM FINAL DECREE. Now comes the plaintiff in the above entitled cause of action and appeals to the Supreme Judicial Court from the final decree entered in the Superior Court sustaining the demurrers of the defendants to the plaintiff's Substitute Bill of Complaint."

1. It is contended that the case is not rightly before us and that the court is without jurisdiction to consider it, on the ground that by its terms the appeal is limited to the interlocutory decree and does not apply to the final decree, and that the appeal was not filed within the period of twenty days allowed by the statute after its entry, which is the maximum limit of time. If this be an appeal from the interlocutory decree, it was not seasonably filed; if it be an appeal from the final decree, it was seasonably filed. G. L. c. 214, §§ 19, 26.

Pleadings, decrees and papers on the files of courts are commonly to be interpreted in accordance with their true character without much regard to their name or title. *Frati* v. *Jannini*, 226 Mass. 430, 432. *E. S. Parks Shellac Co.* v. *Jones*, 265 Mass. 108, 110. The plaintiff's appeal in its title was described to be from the final decree. In the body of the appeal it is stated to be from the final decree; the reference to it as sustaining the demurrers specified the conclusion of the trial judge which led to the entry of the final decree. This reference was an error. It might in some circumstances have been perilous. It does not, however, destroy the real effect of the paper. It is to be presumed that the plaintiff intended by his appeal to accomplish something and not do a futile act. To attempt to appeal on July 30, 1931, from the interlocutory decree would have been vain. To appeal on that date from the final decree would be effectual to secure to the plaintiff a review of the final and decisive action of the trial court.

In our opinion the paper filed by the plaintiff on July 30, 1931, and already quoted, is to be construed as an appeal from the final decree.

Upon this appeal the correctness of an interlocutory decree, so far as the final decree is affected erroneously thereby, is open for consideration. *O'Brien* v. *O'Brien,* 238 Mass. 403, 408.

2. Since the case comes before us on bill and demurrers, no intendments can be made in favor of the bill. The plaintiff must plead every material fact essential to establish a right to relief. *Bowker* v. *Torrey,* 211 Mass. 282, 286. *Lexington Board of Survey* v. *Suburban Land Co.* 235 Mass. 108, 112.

3. This suit is brought on the theory that the directors, the bankers and the appraisal company were the promoters of the new corporation and that on the facts set forth in the bill the profits made by the promoters out of the transactions may be recovered to be paid to the new corporation. Those who undertake to form a new corporation, to procure for it the rights and capital by which it is to carry out the purposes set forth in its charter, and to establish it as able to do its business, are its promoters. They occupy a fiduciary relation to the corporation and are charged with the duties imposed by good faith in their dealing with it. The liability of promoters has been somewhat discussed in three of our decisions, and the governing principles elaborated. In any case involving the legal responsibilities of promoters, it is necessary first to recur to those principles as set forth in *Hayward* v. *Leeson,* 176 Mass. 310; *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 188 Mass. 315, and the same case as reported in 203 Mass. 159. Those principles, so far as here pertinent, may be briefly recapitulated. In some circumstances promoters may make sale of their own property to the corporation. Secret and unlawful profits may not be made by the promoters out of such sales but may be recovered by the corporation. A profit is not secret or unlawful if all the parties having a direct interest know of it and assent to it, or do not repudiate it. Those owning all the capital stock contemplated by

the scheme of promotion as an original issue are the persons interested in such sale and profit. Where, therefore, it is a part of the scheme of promotion that capital stock be issued to the public as original subscribers, and no disclosure is made to such original subscribers or to an independent board of officers acting for the corporation, and there is no subsequent ratification of the transaction by the corporation after full disclosure, then, if other necessary factors are present, profits made by promoters in sale of their own property to the corporation may be recovered by the corporation. There may be such recovery of secret profits even though all the stockholders who have become subscribers at the time of the transaction may know and assent, provided, as a part of the scheme of promotion, there is unissued capital stock to be directly and subsequently in fact sold, for the purpose of securing working capital, to members of the public as original subscribers to whom no disclosure is made of the profit of the promoters and who have no knowledge of it. But the corporation cannot recover profits made by its promoters in selling to it their own property, provided the promoters either (1) are or become the real, original subscribers of all the shares of capital stock contemplated as a part of the scheme of promotion, or (2) make a full disclosure of the material facts to each original subscriber of capital stock. The reason for this limitation is that all persons contemplated by the scheme of promotion as having a present or potential interest in the corporation as original subscribers of capital stock have assented to the profit or, knowing of it, have failed to repudiate it. Buyers of stock from such original subscribers take it subject to its incidents and burdens in the hands of their vendors. Such subsequent transferees may sustain an injury personal to themselves, but that is not an injury to the corporation or to all the stockholders collectively.

The allegations of the present bill already summarized do not bring the case within the rule of liability of promoters formulated and applied in the *Old Dominion* case, 203 Mass. 159. That was a case where the scheme of pro-

motion comprehended (1) a sale of their property by the promoters to the corporation at an excessive valuation with large profits to themselves; (2) no approval of the sale by an independent board of directors after full disclosure of all material facts; (3) subsequent original issue of stock by the corporation, to procure its working capital, directly to initial subscribers without disclosure to them of the profit made by the promoters; and (4) no subsequent ratification of the sale by the stockholders of the corporation after disclosure to them of all material facts. The opinion in that case carefully marks the distinction between an original issue of stock by the corporation directly to an innocent and unenlightened subscriber and an issue of stock to promoters followed by transfer by them to innocent and unenlightened purchasers. There are no allegations in the present bill clearly stating the third of the four factors just mentioned as essential to the decision in the *Old Dominion* case. According to the allegations of the present bill, all the Class A preference stock of the new corporation, so far as issued, was issued toward the purchase of the assets of the old corporation and for cash to the bankers; and all the common stock was also so issued except 10,000 shares left in the treasury of the corporation. There is no allegation that these 10,000 shares were intended as a part of the scheme of promotion to be sold as soon as practicable, or at some remote and undetermined future date, or to be sold directly by the corporation to uninformed original subscribers; nor is there any allegation that they were so sold. The averment is that the bankers in every instance became the original subscribers and received and paid for these shares of stock before delivery to the subsequent purchasers. There are no allegations of sale of any of the 20,000 shares of Class A preference stock remaining unissued. On the contrary, the promotion scheme outlined in the bill is that the corporation shall issue preferred and common stock "for resale to the public on a basis" which would "yield to the defendant directors and to the bankers" unconscionable profit. The bankers were not stockholders in the old company. Therefore they could not share in

excessive profits arising from the sale of the assets of the
old corporation to the new corporation. It is not alleged
that the bankers received any of the shares of stock in the
new corporation issued to the old corporation for the pur-
chase of its assets, except as they sold it for the benefit of the
directors who received it from the old corporation. The
only way in which there could be yielded to the bankers
"unconscionable profit" was by their subscribing to other
stock issued by the new corporation for "resale to the
public" at prices to accomplish that result. This is mani-
festly a different scheme of promotion from that before the
court in the *Old Dominion* case. The trial judge ruled
respecting the 10,000 shares of common stock that it "does
not appear that this stock was to be sold directly to the
public as original subscribers rather than through the
bankers or otherwise, nor does it appear whether there was
any present intention to sell it as part of this promotion
scheme or only some remote idea of doing so at some future
time, nor does it appear what information would be given
to purchasers." He also ruled that the bill is literally con-
sistent in all its statements "that the plan of promotion did
not contemplate the original issue by the corporation of any
stock to uninformed stockholders, and that no such stock
was in fact issued, but that all stock issued was originally
issued to the promoters and conspirators, and that when
other persons, including the plaintiff, acquired stock, they
acquired it from the promoters and not from the corpora-
tion, and knew that they were not buying from the cor-
poration as original subscribers." This construction of the
allegations of the bill was right. He further ruled that "no
stockholder can sue unless there has been or is to be an
issue of stock direct by the corporation to innocent sub-
scribers and, unless this appears, all stockholders are left
to any individual causes of action which they have against
the persons" selling them stock. This is in accord with
what was said in 188 Mass. 315, at page 325: "In such a
case the transaction complained of is acquiesced in not only
by all those interested but by all who it is contemplated
shall be interested in the corporation except as third per-

sons should acquire the interest of some one or more of those persons. Such third persons are bound by the acquiescence of their vendors, and such a corporation is bound by the acquiescence of all its stockholders." This was said as a part of the chain of reasoning upon which the decision rested. This principle was followed in the later decision in the same case in 203 Mass. 159. In substance and effect this is a succinct statement of the principle that, if the promoters and those acting in concert with them are the original subscribers to the entire capital stock contemplated to be immediately issued and they then sell those shares, without disclosure of the profits of the promoters, to outside parties, there is no fraud on the corporation and no ground for complaint by it even though the promoters may derive large profits from the transaction. That principle seems to prevail generally. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. 159, 185, 186, 190, and cases collected. *Mile Wide Copper Co.* v. *Piper*, 29 Ariz. 129. *Hamilton* v. *Hamilton Mammoth Mines, Inc.* 110 Ore. 546, 553. *Metcalfe* v. *Mental Science Industrial Association*, 127 Wash. 50, 58. *Attorney General for Canada* v. *Standard Trust Company of New York*, [1911] A. C. 498. *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 210 U. S. 206, at page 215. *Allenhurst Park Estates, Inc.* v. *Smith*, 101 N. J. Eq. 581, 594–595. *Mason* v. *Carrothers*, 105 Maine, 392, 405–408. See 14 C. J. pages 293–295, and Ehrich on Promoters, § 120, for collections of further authorities.

No exception to this principle has been established to cover instances where the promoters intend an immediate resale to the public of stock actually issued to them. Relief is granted against frauds on the part of the promoters which bear only a superficial resemblance to the case at bar. It is not necessary to review them. Many are discussed in 203 Mass. 159. See, also, *Davis* v. *Las Ovas Co. Inc.* 227 U. S. 80; *Official Receiver & Liquidator of Jubilee Cotton Mills, Ltd.* v. *Lewis*, [1924] A. C. 958; *In re Darby*, [1911] 1 K. B. 95, and *California-Calaveras Mining Co.* v.

*Walls*, 170 Cal. 285. Whether one is defrauded in buying stock as an original subscriber in a corporation, or as the vendee of an original subscriber, may not have effect on the extent of the loss to the person defrauded. But the distinction appears to us to be founded on a substantial basis. When one as an original subscriber buys stock directly from a corporation in conformity to the plan for its promotion, the parties to the transaction are the subscriber and the corporation. The subscriber has a right to assume that the corporation has been honestly organized. There is something akin to an implied representation on the part of the corporation that there has been no breach of duty toward it on the part of its promoters. The invitation to the public to become original subscribers to stock as a part of the scheme of promotion imports a representation by promoters that the corporation, has been honestly organized without violation of their fiduciary duty to it. The scheme of promotion contemplates an assumption of this nature by original subscribers because there is a general presumption in favor of honesty. *Patterson* v. *Pendexter*, 259 Mass. 490, 494. Therefore, when there has been a breach of that duty, equity affords to such original subscriber a right to enforce a remedy for the wrong done to the corporation resulting in harm to him by reason of his relation to it as an original subscriber. Where one is not an original subscriber to stock but purchases shares from a broker or other vendor of stock, the corporation is not a party to the transaction. If any wrong is committed on the buyer, it is by the seller, not by the corporation. The buyer, under those circumstances, is not in a position to enforce rights of the corporation. Such a case bears some analogy to the rule that, where the act of an intelligent and responsible human being intervenes between an original cause and a resulting damage, the law will not look beyond the cause most recently operative. See *Carini* v. *Roman Catholic Bishop of Springfield*, 219 Mass. 117, 119. The buyer has gone into the market to make an investment. He knows that he is not an original

subscriber.    He becomes a holder of stock because of a direct relation not to the corporation but to his vendor.

The case at bar, in our opinion, comes within the sweep of the general principle.    The circumstance that the bankers, after the establishment of the new corporation, took title directly from it as original subscribers from time to time of shares of common stock and resold to the public, does not take the case out of the operation of the general principle. It is not alleged that the bankers in this respect acted as agent for the new corporation, or as agent for the persons to whom they sold those shares.    On the contrary, the allegations are that the stock was issued "for resale to the public" and that the bankers were acting for themselves and the directors.    No relation of trust and confidence is shown in these transactions.    In view of these allegations the purchasers of stock from the bankers cannot be regarded as equitable original subscribers with all the rights accorded to actual original subscribers.    No question is here involved between bankers and their customers.    The case at bar is distinguishable from *California-Calaveras Mining Co.* v. *Walls,* 170 Cal. 285, where the original promoter practised a fraud on those associated with him in the enterprise and, although as a part of that fraud all the capital stock was issued to him, most of it was turned back into the treasury of the corporation for distribution to his associates and for sale to the public.    It is also distinguishable from *Fred Macey Co.* v. *Macey,* 143 Mich. 138, where the promoters had sold a large amount of treasury stock to the public before the corporation was organized and thus the buyers were in truth original subscribers.    The same principle was followed in *Allenhurst Park Estates, Inc.* v. *Smith,* 101 N. J. Eq. 581.

The bill joins in one suit the charges against the directors and bankers already stated, with charges against the directors for voting themselves excessive salaries as officers of the new corporation.    One ground on which the demurrers were sustained was that the bill was multifarious. Courts have not undertaken to establish any exact test

by which to determine multifariousness. Each case must depend largely on its own circumstances. It is manifest that the bankers and the appraisal company had no connection with the excessive salaries alleged to have been voted by the directors to themselves. That was not a part of the promotion of the new corporation. There is no allegation that any party save the directors alone had connection with voting or receiving the salaries. This matter does not appear to be in any manner bound up with the other grounds of complaint. We think that the bill in this particular is open to the objection of multifariousness. *Reno* v. *Cotter,* 236 Mass. 556, 563. *Raynes* v. *Sharp,* 238 Mass. 20, 25. *Spear* v. *H. V. Greene Co.* 246 Mass. 259, 269–270. *Farquhar* v. *New England Trust Co.* 261 Mass. 209, 216. *Cedar* v. *Superior Credit Corp.* 276 Mass. 197.

It is not necessary to consider the other grounds of demurrer.

*Decree affirmed.*