## McCANDLESS v. FURLAUD et al.
### No. 251.

Circuit Court of Appeals, Second Circuit.
March 4, 1935.

Ehrich, Royall, Wheeler & Walter, of New York City (Ralph Royall and James G. Holland, both of New York City, and William A. Magee, of Pittsburgh, Pa., of counsel), for plaintiff.

Eppstein & Hirshfield, of New York City (Louis B. Eppstein, Ira W. Hirshfield, and Louis J. Altkrug, all of New York City, of counsel), for defendants Maxime H. Furlaud, Kingston Corporation, Byron Corporation, and Chaucer Corporation.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The defendants Maxime H. Furlaud and Kingston Corporation appeal from a decree awarding the plaintiff the sum of $1,834,-640.08 in an accounting suit for all funds or moneys coming into the hands of the defendants or any of them from the sale of bonds, notes, and shares of stock of the Duquesne Gas Corporation.

A receiver was appointed for the Duquesne Gas Corporation in the United States District Court for the Western District of Pennsylvania, and he sued in the District Court for the Southern District of New York, without appointment therein as an ancillary receiver. We reversed the decree, on a former appeal, for failure to have an ancillary receiver appointed in the Southern District of New York before suit. 68 F. (2d) 925. The Supreme Court reversed (55 S. Ct. 42, 79 L. Ed. ——), remanding the cause to this court to pass upon the merits of the issues presented.

The gravamen of the bill of complaint is to be found in paragraph 17, which alleges that the receiver is entitled, on behalf of the Duquesne Gas Corporation, to have the defendants account to the corporation "for the funds or moneys coming into their hands or into the hands of any of them or their agents or representatives from the sale of the securities of said Duquesne Gas Corporation or of any of said securities, and for the disposition made of such funds or moneys and to make restitution for any or all of such funds or moneys wrongfully diverted from Duquesne Gas Corporation and misappropriated or converted by the defendants or any of them to their own uses and for any

or all secret or excessive profits taken or retained by them. * * * "

The prayer for relief asked that the defendants be compelled to account "for all funds or moneys coming into the hands of them or any of them or of the agents or representatives of any of them or in the hands of any one else acting with or for them from the sale of the bonds, notes and shares of stock of said Duquesne Gas Corporation."

The Kingston Corporation was organized under the New Jersey laws March 10, 1926; Furlaud & Co., Inc., incorporated under the New York laws July 18, 1928. The latter was authorized to promote and assist in the financing of corporations, firms, and syndicates in selling issues of securities. Defendant Maxime H. Furlaud was its president.

In 1929, the Kingston Corporation, a wholly owned subsidiary of Furlaud & Co., Inc., obtained options on various oil and gas properties in Western Pennsylvania, at a total purchase price of $2,572,989. Some of these options were taken in the name of an individual and later assigned to the Kingston Corporation. The properties were examined by engineers and appraisals were made; some, examined by one firm, at $4,929,787, and others, by another engineer, at $1,743,520. On February 21, 1930, Furlaud & Co., Inc., caused the Duquesne Gas Corporation to be organized under the Pennsylvania laws with a capital issue of 1,000 shares of no par value common stock. This was all subscribed and paid for by Furlaud & Co., Inc., at 50 cents a share, a price authorized by the board of directors of the Duquesne Gas Corporation. Arrangements were then made for the owners of the optioned properties to execute deeds to the Duquesne Gas Corporation to be held in escrow in various banks in and around Western Pennsylvania, with directions to deliver them upon the payment of the purchase price. Prior to the date of closing, April 9, 1930, a bankers' syndicate was organized consisting of Furlaud & Co., Inc., as managers and other banking houses, to purchase when and if issued and to distribute in allotted territories, first mortgage 6 per cent. gold bonds of the Duquesne Gas Corporation of a par value of $4,000,000 which it was arranged the Duquesne Gas Corporation would issue. On March 19, 1930, Furlaud & Co., Inc., as such distributing group manager, advised security dealers by letter that it had purchased "when, as and if is-

sued" the bonds of the Duquesne Gas Corporation, and offered to sell these securities to the dealers for resale by them. A subscription blank accompanied the offer. It was filled in and returned to Furlaud & Co., Inc., with each dealer's order. On March 25, 1930, an advertisement appeared in a New York newspaper over the names of the five members of the bank syndicate, offering the securities for sale. At this time, when the entire stock of the Duquesne Gas Corporation was held by Furlaud & Co., Inc., the gas company authorized the issuance of $4,000,000 first mortgage bonds, and also $1,000,000, 6½ per cent. notes to be secured by mortgages, and the authorized capital stock was increased from 1,000 to 1,250,000 shares of common stock without par value.

On April 7, 1930, an agreement of reorganization was entered into between the Duquesne Gas Corporation and the Kingston Corporation by which the latter agreed it would cause the optioned properties, all its assets other than cash, to be transferred to the Duquesne Gas Corporation, which in turn agreed to issue to the Kingston Corporation 535,000 shares of common stock without par value and $1,300,000 principal amount of convertible gold bonds and to assume an obligation of the Kingston Corporation to the Central Hanover Bank & Trust Company in the sum of $3,015,000. Prior to the closing on April 9, 1930, two loans were made by the Central Hanover Bank & Trust Company, one for $3,015,000 for the Kingston Corporation, and the other for $3,379,500 to Furlaud & Co., Inc.

The Kingston Corporation, at the closing, delivered its certified checks, drawn on the Central Hanover Bank & Trust Company, for a total of $2,449,900 to the Equitable Trust Company, the Guarantee Trust Company of New York, and the Central Hanover Bank & Trust Company, respectively. These checks put the banks in funds to meet the drafts, in their hands, drawn on the Kingston Corporation by the banks in Western Pennsylvania, which held in escrow the deeds transferring the properties to the Duquesne Gas Corporation. The Western Pennsylvania banks released the deeds upon being notified of the aforesaid payments. Upon receiving telegraphic and telephonic advice that the deeds had been recorded, the Duquesne Gas Corporation issued the securities to the Kingston Corporation in accordance with the terms of the reorganization agreement. At the same

time Furlaud & Co., Inc., pursuant to an agreement of April 7, 1930, delivered its check, drawn on the Central Hanover Bank & Trust Company, for $3,379,500 to the Duquesne Gas Corporation as the purchase price for $2,700,000 par value 6 per cent. bonds at 90, and $1,000,000 6½ per cent. gold notes of the Duquesne Gas Corporation at 88, and 139,000 shares of its common stock at 50 cents a share. These securities were immediately delivered to Furlaud & Co., Inc. Duquesne Gas Corporation then drew its check for $3,015,000 to the order of the Central Hanover Bank & Trust Company in payment of the Kingston Corporation's one day loan, the payment of which the Duquesne Gas Corporation had assumed. The Duquesne Gas Corporation then had left in its treasury $365,000.

On the day of the closing, some of the security dealers, who had agreed to purchase about $2,350,000 face value of the bonds, sent their representatives to the Central Hanover Bank & Trust Company with checks payable to the order of Furlaud & Co., Inc., and picked up the bonds which they had agreed to purchase. The checks thus received totaled $1,886,330. Furlaud & Co., Inc., then paid its loan to the Central Hanover Bank & Trust Company by the application of $1,886,330—$700,000 it had borrowed from the Catham & Phenix National Bank & Trust Company, $300,000 borrowed from the Hibernia Trust Company, and $500,000 borrowed from the Pacific Trust Company. Furlaud & Co., Inc., then paid its other bank loans. The Kingston Corporation turned over to Furlaud & Co., Inc., $300,000, certain expense moneys advanced by Furlaud & Co., Inc., in connection with the acquisition of the properties, and at the same time the Kingston Corporation loaned Furlaud & Co., Inc., $265,000. The entire issue of bonds was not disposed of on April 9, 1930, and Furlaud & Co., Inc., organized a secondary distributing group in August, 1930, to sell them. Furlaud & Co., Inc., made purchases in the open market totaling $1,194,000 which it disposed of from time to time up to July, 1931. A few weeks after the closing, Furlaud & Co., Inc., sold the $1,000,000 gold note issue to another security house for $886,546.56. Maxime H. Furlaud had no relation to these transactions other than as an officer and director of Furlaud & Co., Inc., and his personal activity in carrying on the negotiations and transactions. He did not participate in the alleged fraudulent appraisal or receive personally any of the moneys paid to Furlaud & Co., Inc.

The recovery below seems to be grounded upon the supposed right of a receiver in sequestration proceedings to recover profits made, which the court thought excessive, and in legal effect, to say that all the moneys resulting from the sale of the securities were held in trust for the benefit of the Duquesne Gas Corporation. Furlaud is held individually on the theory of a breach of trust. No trust funds ever came into his hands.

As stated by the court below:

"At the time that the transactions through which Duquesne Gas Corporation acquired the various gas properties were consummated, and for some time thereafter, Furlaud & Company, Inc., owned every share of its capital stock, and ratified and approved of the whole transaction."

At the end of these transactions, the two corporations, Furlaud & Co., Inc., and its subsidiary, Kingston Corporation, owned all of the issued common capital stock of the Duquesne Gas Corporation, and all of its bonds and notes. No other person purchased from Duquesne Gas Corporation a share of stock, a bond, or a note. Neither a corporation nor its receiver has any right of action against the organizers of the corporation for the recovery of profits made by such organizers in the sale of securities, where the organizers became the owners of all the authorized and outstanding stock of the corporation. Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U. S. 206, 28 S. Ct. 634, 636, 52 L. Ed. 1025; Ball v. Breed, Elliott & Harrison (C. C. A.) 294 F. 227, 232.

The receiver now contends that misrepresentations as to the value of the properties transferred were made on their resale to the Duquesne Gas Corporation. If such be the fact, the receiver may not recover therefor. Old Dominion Copper Mining & Smelting Co. v. Lewisohn, supra. As there stated:

"If there was a wrong, it was when the innocent public subscribed. But what one would expect to find, if a wrong happened then, would not be that the sale became a breach of duty to the corporation nunc pro tunc, but that the invitation to the public without disclosure, when acted upon, became a fraud upon the subscribers from an equitable point of view, accompanied by what

they might treat as damage. For it is only by virtue of the innocent subscribers' position and the promoter's invitation that the corporation has any pretense for a standing in court. If the promoters, after starting their scheme, had sold their stock before any subscriptions were taken, and then the purchasers of their stock, with notice, had invited the public to come in, and it did, we do not see how the company could maintain this suit. If it could not then, we do not see how it can now."

The principle announced in Ball v. Breed, etc., supra, by this court, is applicable here. There a suit was brought by a receiver on the theory that the profits made by the promoters were without the knowledge and consent of the corporation, and that the corporation does not consent if any existing stockholder is ignorant of a transaction involving a so-called secret profit. There the secret profit was a matter of contract between one who had acquired an option to purchase the stock, securities, and indebtedness of a corporation, and bankers. The bankers owned all the preferred, common, and founders' stock subscribed for or intended to be issued. No other persons had rights to receive stock from the corporation. There were no innocent stockholders. This court said:

"If, then, there was a fraud, it was not against the corporation, and a cause of action, if any, is personal to the purchasers of the stock. The fraud, if any, is what has been called a subsidiary fraud not affecting the corporation."

In the instant case, as in the Ball Case, at the conclusion of the transaction between the organizers of the corporation and the corporation, all of the stocks and securities authorized and issued and intended to be issued by the corporation belonged to the persons of whose actions the receiver now complains. In the instant case, the organizers of the corporation, in addition to receiving stock of the Duquesne Gas Corporation, also received its bonds and notes, thus embracing all the securities issued. These circumstances forbid the plaintiff maintaining that a trust was created for any alleged unreasonable profit or any other sums that should have been placed in the treasury of the corporation as a result of the sale of the securities. Blum v. Whitney, 185 N. Y. 232, 77 N. E. 1159; Seymour v. Spring Forest Cemetery Ass'n, 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859; Wells v. Northern Trust Co., 195 Ill. 288, 63 N. E.

136; Allenhurst Park Estates v. Smith, 101 N. J. Eq. 581, 138 A. 709; Tompkins v. Sperry, Jones & Co., 96 Md. 560, 54 A. 254; Hays v. The Georgian, 280 Mass. 10, 181 N. E. 765, 85 A. L. R. 1251.

But the court below said the bondholders were induced to purchase the securities so issued by the Duquesne Gas Corporation by misrepresentations, and, as a result, a trust in favor of the corporation arose, citing McKee v. Lamon, 159 U. S. 317, 16 S. Ct. 11, 13, 40 L. Ed. 165; Sayer v. Wynkoop, 248 N. Y. 54, 161 N. E. 417. In the McKee Case, the money was turned over to McKee in trust requiring him to pay over to "all parties who have rendered service * * * in the prosecution of said claim" the amount due to such persons. In the Sayer Case, the money was due to an insurance company as premiums on policies, and the debtor made payment to his broker with instructions to pay these premiums. In each case a property right existed in favor of the plaintiff in the fund delivered to the trustee for a specific purpose. Here, if any misrepresentation was made in the sale of the securities under the circumstances above described, a cause of action might exist against Furlaud & Co., Inc., or the other banking houses, by the security holders, but no trust was created in favor of the corporation for any of the moneys received. Piggly-Wiggly Delaware, Inc., v. Bartlett, 97 N. J. Eq. 469, 129 A. 413; Whitten v. Dabney, 171 Cal. 621, 154 P. 312; Turner v. Markham, 155 Cal. 562, 102 P. 272; Vigers v. Pike, 8 Cl. & F. 562.

To be sure, in so far as the property of the corporation is concerned, the receiver holds it for the benefit of all creditors. As to such property, he may be regarded as a trustee. The property that is transferred to him as the receiver of such corporation for administration is the property of the corporation. This does not include any personal rights or property belonging to others who are not parties to the receivership proceedings. It does not include the personal rights of the individuals who have become bondholders. To establish a cause of action, for the bondholders, for fraud in the issuance of these bonds, it is necessary to allege and prove not only that false representations were made, but that they were materially so. It is also essential to show that the purchaser relied upon such misrepresentations and believed them to be true, acting upon them and making his investments upon such reliance. Scovill v. Thay-

er, 105 U. S. 143, 26 L. Ed. 968; Foster v. Seymour (C. C.) 23 F. 65. And if there be any wrong, it was a wrong individual to the bondholders; it was not a wrong against the Duquesne Gas Corporation, at least such as can be held to be the result of a breach of trust as pleaded and claimed in support of this cause of action.

Cross-appeal affirmed, with directions to dismiss the bill. Decree reversed.